ROBERTA ANN SHERWOOD *v.* DANBURY HOSPITAL
(SC 17202)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

164

Argued May 19, 2005—officially released May 16, 2006

*Carey B. Reilly*, with whom was *Michael P. Koskoff*, for the appellant (plaintiff).

*Jeffrey R. Babbin*, with whom were *Christian Turner* and, on the brief, *Kenneth F. Baum*, for the appellee (defendant).

*Opinion*

PALMER, J. This case returns to us for a second time. The plaintiff, Roberta Ann Sherwood, commenced this action against the defendant, Danbury Hospital, alleging that she had contracted the human immunodeficiency virus (HIV), the virus that causes acquired immune deficiency syndrome (AIDS), from a blood transfusion that she had received during surgery. After the trial court, *Radcliffe, J.*, rendered judgment for the defendant because, among other things, the plaintiff's action was barred by the three year statute of repose contained in General Statutes § 52-584,[1] the plaintiff appealed. We reversed in part the trial court's judgment, concluding that a genuine issue of material fact existed with respect to whether the three year repose provision of § 52-584 had been tolled by the continuing course of conduct doctrine. *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 195–96, 746 A.2d 730 (2000). Following our remand, the trial court, *Schuman, J.*, rendered judgment for the defendant, concluding, inter alia, that the defendant did not have a duty to inform the plaintiff of the risks associated with the blood transfusion that she had received during surgery. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgment of the trial court.

The facts and procedural history relevant to this appeal, some of which are set forth in our opinion in

[1] General Statutes § 52-584 provides in relevant part: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ."

*Sherwood* v. *Danbury Hospital,* supra, 252 Conn. 193, may be summarized as follows. "On March 2, 1985, the Food and Drug Administration approved the enzyme-linked immunosorbant assay test (ELISA test) for the purpose of screening units of blood for antibodies associated with [HIV]. Ramon Kranwinkel, a pathologist and hematologist, who, at all relevant times, was the director of the [defendant's] blood bank . . . testified in a deposition that he had learned of the Food and Drug Administration's ratification of the ELISA test 'sometime in 1985, earlier that year, probably around February, but [was] not sure of the exact date.' " Id., 196–97.

On or about March 5, 1985, Ritchard G. Cable, a physician and then the Connecticut regional medical director of the American Red Cross (Red Cross), sent a memorandum to all of the hospital blood bank directors in Connecticut informing them that the federal government had approved the ELISA test and that he had contacted Abbott Laboratories, the first vendor of the test, for the purpose of planning the "implementation of testing blood donors in Connecticut as soon as possible." Cable further stated in the memorandum that information pertaining to the Red Cross' implementation of the test would be discussed at a meeting of the State Medical Society committee on organ and tissue transfers to be held on March 12, 1985. According to the minutes of that meeting, Cable discussed the Red Cross' plan to phase in the ELISA test over several weeks but explained that the Red Cross would not officially announce the implementation of the test until approximately one month after all newly donated blood had been tested.[2] In fact, the Red Cross commenced

---

[2] Although Kranwinkel did not attend the meeting, Maria Gudino, a medical resident and fellow in the defendant's clinical pathology program, did attend the meeting. At her deposition, Gudino testified that she could not recall whether she had told Kranwinkel about what had transpired at the meeting but that it would have been her custom to do so.

ELISA testing on March 7, 1985. Not all new donations of blood were tested, however, until March 22, 1985.[3]

"On April 18, 1985, Dennis [Ogiela, an orthopedic surgeon with hospital privileges who was treating the plaintiff], admitted the plaintiff to the [defendant] hospital for the treatment of congenital scoliosis. The next day, April 19, 1985, the plaintiff underwent a posterior spinal fusion during which she received four units of blood. The blood was provided to the [defendant] by the . . . Red Cross . . . and had an expiration date of April 22, 1985." *Sherwood* v. *Danbury Hospital,* supra, 252 Conn. 197. The plaintiff's surgery was elective in nature and could have been postponed for several months without any adverse consequences to her health.

"The plaintiff, in an uncontroverted affidavit, swore that, prior to her surgery: (1) she 'did not know of the risk of contracting HIV from a blood transfusion and [that] the [d]efendant did not inform [her] of [that] risk'; (2) she 'did not know that [she] had the option [of banking her] own blood for the surgery and [that] the [d]efendant did not tell [her] of [that] option'; (3) she 'was not aware that there was a test to detect the presence of . . . HIV [antibodies] in blood'; (4) she 'did not know that [she] was given untested blood'; and (5) 'no one ever told [her] that [she] could [have] postpone[d] [the] surgery until tested blood was available.'

---

[3] According to Cable, the Red Cross' decision to refrain from disclosing when implementation of the ELISA test would commence was an attempt "to keep the blood supply safe" in light of the concern that people who were at risk for HIV would donate blood simply to determine their HIV status. Cable also explained that secrecy surrounding the Red Cross' implementation of ELISA testing was such that, during the time period in which the test was being phased in, not even hospital blood banks knew which units of donated blood in their possession had been tested for HIV antibodies. Cable further explained that hospital blood banks were not informed as to when the ELISA testing program would be fully implemented, that is, when all newly donated blood would be tested.

"Kranwinkel testified that neither he nor anyone else from the [defendant's] blood bank had told the plaintiff, prior to surgery, that the ELISA test was available for screening blood for the presence of HIV antibodies. Kranwinkel further testified that when the plaintiff was transfused, he had assumed that the blood had not been tested for the presence of HIV antibodies." Id. Ogiela, the plaintiff's treating physician, testified that he had advised the plaintiff prior to surgery that a blood transfusion likely would be required and of the general risks associated with blood transfusions, including the risk of contracting HIV. Ogiela further testified that he had informed the plaintiff that she could bank or donate her own blood to be used during the surgery.[4] Ogiela conceded, however, that, at that time, he was unaware that a test had been approved for screening HIV antibodies in blood and that all newly donated blood would be tested in the very near future. Ogiela further acknowledged that he therefore had not advised the plaintiff about the option of postponing surgery until fully tested blood became available. Moreover, according to the plaintiff's experts, at the time of the plaintiff's surgery, it was common knowledge in the medical community that the Food and Drug Administration had approved the ELISA test, that the test would be fully implemented very shortly and that all elective surgery should be postponed until after the blood supply had been tested completely.

"On, or shortly after, April 20, 1985, the day after the plaintiff's transfusion, Kranwinkel received a letter from the Red Cross. The letter stated that, 'effective April 22, 1985, all units of whole blood and blood components routinely distributed by the American Red Blood

---

[4] An individual's donation of his or her own blood and subsequent receipt of that blood during a transfusion is known as an autologous transfusion. See Mosby's Medical, Nursing, and Allied Health Dictionary (6th Ed. 2002) p. 164.

Services, Connecticut Region, will have been determined to be nonreactive when tested for [HIV antibodies].' The letter requested [that] the [defendant] . . . 'promptly return' to the Red Cross all units of blood remaining in its inventory that had [been collected prior to March 22, 1985].[5] Kranwinkel testified that the [defendant's] blood bank had complied with this request. Kranwinkel further testified that, had the plaintiff not received the units of blood that [had been] used during her transfusion, those units would have been among the units returned to the Red Cross." Id., 198. Prior to his receipt of the April 20, 1985 letter, however, Kranwinkel had no way of knowing which units of blood in the defendant's inventory had been tested for the presence of HIV antibodies and which units had not been tested.[6]

"On September 1, 1994, following a routine blood test ordered by Micheline Williams, the plaintiff's physician, the plaintiff learned for the first time that she had contracted HIV. An investigation ensued, through which the plaintiff learned, for the first time, on March 14, 1995, that the source of her HIV infection was contaminated blood administered to her during the April 19, 1985 transfusion.

"The plaintiff's uncontroverted affidavit also contained numerous, specific factual statements regarding

---

[5] Because the Red Cross phased in the ELISA testing program from March 7, 1985, to March 22, 1985, without notifying hospital blood banks, including the defendant's blood bank, that all newly donated blood would not be tested until March 22, 1985, and because the shelf life of a unit of red blood cells is approximately thirty-five days, the defendant's blood bank had both tested and untested blood in its inventory when it received the April 20, 1985 letter from the Red Cross.

[6] We reiterate that, because the Red Cross did not inform hospital blood banks, during the period in which the ELISA testing program was being phased in, which units of blood had been tested, those blood banks, including the defendant's blood bank, did not know which units of blood in their inventories had, in fact, been tested.

the absence of any information given by the defendant to the plaintiff following the transfusion. She swore that 'at no time' did the defendant tell her that: (1) 'the ELISA test was available at the time of [her] surgery'; (2) 'the blood [that she] was given during surgery was not tested for the presence of HIV [antibodies]"; (3) 'the blood [that she] was given [during] surgery [had been] "recalled" by the Red Cross'; and (4) '[she] could have postponed her surgery . . . a few days' until tested blood became available.

"The plaintiff also submitted . . . an uncontroverted affidavit from Elizabeth Donegan, a physician who, from 1985 to 1991, had been in charge of operating a blood bank at a hospital affiliated with the University of California at San Francisco, a community with a large population infected with HIV. Donegan was retained as an expert witness by the plaintiff and stated in her sworn affidavit that: (1) she directed a program at her hospital between July, 1987, and October, 1987, 'to notify all persons who had been recipients of untested blood dating back to approximately the time [her hospital] was aware of the . . . presence [of HIV] in [the] community'; and (2) in March, 1987, 'the Center for Disease Control . . . issued a recommendation that recipients of multiple transfusions between 1978 and late spring of 1985 be advised that they were at risk for . . . HIV . . . infection and [be] offered HIV antibody testing.' " Id., 198–99.

On July 9, 1996, the plaintiff commenced this action against the defendant[7] alleging, inter alia, that the defendant negligently had supplied untested blood for the plaintiff's blood transfusion and negligently had failed to inform the plaintiff, both before and after her surgery,

[7] The plaintiff also filed separate actions against Ogiela and the Red Cross. The plaintiff's action against the Red Cross has been settled; her action against Ogiela is pending.

that she was at risk for HIV infection.[8] The defendant denied any negligence and, in addition, raised a special defense that the plaintiff's negligence claim was barred by the three year repose period of § 52-584.[9] The defendant thereafter filed a motion for summary judgment,

[8] The plaintiff alleged that the defendant negligently had failed to inform either the plaintiff *or* Ogiela of the risks associated with a blood transfusion from its blood supply. With respect to this contention, the plaintiff, in her brief filed in this court, argues in relevant part: "The plaintiff does not claim that the defendant had an independent duty to warn Ogiela of the risks associated with [its] blood supply, separate and apart from its duty to warn [the plaintiff]. What the plaintiff alleges is that the defendant owed [the plaintiff] the duty to warn of the dangers in its blood and that *warning her physician could discharge that duty.*" (Emphasis added.) As we explain more fully hereinafter, however, Ogiela *alone* had a duty to inform the plaintiff of the risks associated with her surgery, including the risks associated with receiving a blood transfusion prior to the date that all of the blood in the defendant's blood bank had been tested for HIV antibodies. Because we conclude that the defendant had no duty to inform the plaintiff, either directly or indirectly, about the status of its blood supply, the defendant was under no obligation to inform either the plaintiff or Ogiela of that fact.

[9] With respect to her negligence claim, the plaintiff alleged in her complaint that the defendant "was negligent in at least one of the following ways, some or all of which may be continuing, in that the [d]efendant:

"a. administered blood to the [p]laintiff that was contaminated with HIV;

"b. administered blood to the [p]laintiff that had not been tested for the presence of HIV;

"c. administered blood to the [p]laintiff that had not been tested for the presence of HIV when tested blood was available for administration;

"d. failed to test the blood given to the [p]laintiff for the presence of HIV;

"e. failed to confirm that the blood which it administered to the [p]laintiff had been adequately tested for the presence of HIV;

"f. failed to adopt an adequate system of quality assurance to monitor the quality of blood being given to patients of the [d]efendant, including the [p]laintiff;

"g. failed to adopt an adequate infection control program to prevent the acquisition and/or administration of blood that had not been tested for, or was contaminated with, HIV;

"h. failed to adopt adequate rules, regulations and protocols for the screening of blood;

"i. failed to warn the [p]laintiff that the blood had not been tested for the presence of HIV;

"j. failed to warn the [p]laintiff of the risk of contamination of HIV;

"k. failed to advise the [p]laintiff or her physician to postpone elective surgery until safe blood became available;

asserting that the plaintiff's negligence claim was untimely under that three year repose provision because the plaintiff had received the blood transfusion on April 19, 1985, but had not brought her action against the defendant until July 9, 1996, more than eleven years later. The trial court, *Radcliffe, J.*, agreed with the defendant that the plaintiff's claim was barred by § 52-584 and, accordingly, granted the defendant's motion for summary judgment and rendered judgment thereon for the defendant.

The plaintiff appealed from the trial court's judgment, claiming, inter alia, that the trial court improperly had determined that her negligence claim was time barred by § 52-584. Id., 195. In particular, the plaintiff maintained that the continuing course of conduct doctrine had tolled the commencement of that statutory repose period until March 14, 1995, the day that she first had learned the cause of her HIV infection. See id., 202. We reversed in part the judgment of the trial court, observing, first, that the continuing course of conduct doctrine is applicable if the defendant: "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the original wrong; and (3) breached that continuing duty." Id., 206. With respect to the first prong of the doctrine, we stated: "It is undisputed that: (1) prior to the plaintiff's transfusion, the Food and Drug Administration approved the ELISA test for screening units of blood for HIV antibod-

"l. failed to advise the [p]laintiff of her option to obtain [an] autologous blood transfusion and/or [a] homologous blood transfusion through a 'directed donation' program;

"m. failed to advise the [p]laintiff that both tested and untested blood were available for administration;

"n. failed to advise the [p]laintiff that the ELISA test was available for testing blood for the presence of HIV [antibodies]; [and]

"o. failed to advise the [p]laintiff that she had been administered blood contaminated with HIV and/or that she, therefore, had a risk of infection with HIV."

ies; (2) Kranwinkel testified that he assumed that the plaintiff had been administered untested blood; and (3) no one from the [defendant's] blood bank informed the plaintiff, prior to surgery, that the ELISA test was available for screening blood for the presence of HIV antibodies." Id. Relying on this court's statement in *Zichichi* v. *Middlesex Memorial Hospital*, 204 Conn. 399, 410, 528 A.2d 805 (1987), that a hospital that supplies blood for a transfusion must "exercise reasonable care to avoid injury to the [recipient of the blood]," we further stated that "a hospital may be liable for negligently failing to inform a patient of the risks associated with the blood it has supplied for a transfusion." *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 206. On the basis of this observation, we concluded that "there was a genuine issue of material fact with respect to whether the defendant [had] committed an initial wrong upon the plaintiff by failing to inform her that the blood with which she was transfused had not been screened." Id.

With respect to the second prong of the continuing course of conduct doctrine, namely, whether the plaintiff could establish that the defendant owed a continuing duty to the plaintiff that was related to the original wrong, we concluded that, in light of the testimony of Donegan, the plaintiff's expert witness, that it was good medical practice to notify patients who had been transfused with untested blood that they were at risk for contracting HIV, "a reasonable jury could have found that the standard of care required the defendant to have taken steps to notify the plaintiff, after the transfusion, that the blood that she received during her transfusion was not tested for HIV antibodies." Id., 207. With respect to the final prong of the doctrine, namely, whether the plaintiff could show that the defendant had breached its continuing duty to the plaintiff, we stated that the "evidence of the defendant's continuing failure to notify

[the plaintiff after her surgery that she had been transfused with untested blood and was at risk for contracting HIV] was sufficient to create a genuine issue of material fact with regard to whether the defendant [had] breached its ongoing duty of care to the plaintiff." Id., 209. Accordingly, we reversed in part[10] the judgment of the trial court and remanded the case for further proceedings.

After our remand, and following several years of pretrial discovery, the plaintiff filed an amended three count complaint. In the first count of the complaint, in which negligence was alleged, the plaintiff narrowed her allegations to two essential claims: first, that the defendant negligently had failed to advise her or her treating physician, Ogiela, "that the ELISA test was being implemented in Connecticut and that the entire blood supply would be tested soon"; and, second, that the defendant negligently had failed to notify her after her surgery "that she had been administered blood that had not been tested for the presence of HIV [antibodies], and that she, therefore, was at risk for HIV infection

---

[10] We note that, in an earlier complaint, the plaintiff also alleged that the defendant had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by providing the plaintiff with untested blood when tested blood was available. *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 199–200. The trial court, *Grogins, J.*, granted the defendant's motion to strike the plaintiff's CUTPA claim and rendered judgment for the defendant on that claim. Id., 200. On appeal, we affirmed the trial court's judgment with respect to that claim. Id., 214. Specifically, we concluded that the plaintiff's complaint failed to state a legally sufficient CUTPA claim because it did not contain any "specific factual allegations to support [the plaintiff's] claim that the entrepreneurial or commercial aspects of the defendant's business were implicated by its alleged decision to use untested blood when tested blood was available." Id., citing *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 38, 699 A.2d 964 (1997) ("the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel").

and should be tested . . . ."[11] The plaintiff alleged a breach of fiduciary duty in count two of the amended complaint and, in count three, alleged, in accordance with General Statutes § 52-595,[12] that the defendant fraudulently had concealed from the plaintiff the existence of her negligence cause of action against the defendant.

Thereafter, the defendant filed a motion for summary judgment. With respect to the plaintiff's negligence

[11] In her amended complaint, the plaintiff eliminated all allegations that the defendant had been negligent in administering untested blood, as well as all allegations that the defendant had failed to adopt adequate protocols and standards for screening blood. Count one of the amended complaint provides in relevant part: "The [d]efendant . . . was negligent in at least one of the following ways, some or all of which may be continuing, in that the [d]efendant:

"a. failed to take measures to determine whether the units of blood that it purchased, and then administered, provided and/or sold to the [p]laintiff had been tested for the presence of HIV [antibodies];

"b. failed to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . that she was at risk for HIV infection from transfused blood;

"c. failed to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . that the blood supply at [the defendant] [h]ospital had not been fully tested for HIV;

"d. failed to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . that the ELISA test was being implemented in Connecticut and that the entire blood supply would be tested soon;

"e. failed to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . to postpone elective surgery until tested blood became available;

"f. failed to advise [the] [p]laintiff's physician of measures to be taken if the surgery was not postponed including, but not limited to, the use of autologous blood transfusions and a directed donor program;

"g. failed to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . that, if she postponed her operation, tested blood would be available in the near future;

"h. failed to take adequate measures to warn, inform and/or advise the [p]laintiff or the [p]laintiff's physician . . . that she had been administered blood that had not been tested for the presence of HIV [antibodies], and that she, therefore, was at risk for HIV infection and should be tested;

"i. failed to remain educated as to the status of HIV testing in blood . . . ."

[12] General Statutes § 52-595 provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such

claim, the defendant maintained that that claim was, in fact, an informed consent claim and, further, that it was foreclosed under this court's holding in *Petriello* v. *Kalman*, 215 Conn. 377, 576 A.2d 474 (1990), in which we adopted the general rule that a hospital has no legal duty to obtain a patient's informed consent for a surgical procedure to be performed by a nonemployee physician. Id., 384–85. With respect to the plaintiff's claim of a breach of a fiduciary duty, the defendant contended that the plaintiff had failed to demonstrate that the defendant owed a fiduciary duty to the plaintiff. Finally, with respect to the plaintiff's claim of fraudulent concealment under § 52-595, the defendant asserted that that statute does not create an independent cause of action but merely extends the accrual date of a cause of action for statute of limitations purposes.

The plaintiff opposed the defendant's motion for summary judgment with respect to her claims of negligence and breach of fiduciary duty.[13] As to the negligence claim, the plaintiff contended that the trial court should deny the defendant's summary judgment motion on the basis of this court's determination in *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 193, that, because "a hospital may be liable for negligently failing to inform a patient of the risks associated with the blood it has supplied for a transfusion"; id., 206; there existed a genuine issue of material fact as to whether the defendant had breached that duty "by failing to inform [the plaintiff] that the blood with which she was transfused had not been screened." Id. The plaintiff also asserted that the defendant was not entitled to judgment on her claim of a breach of a fiduciary relationship because

person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

[13] The plaintiff did not challenge the defendant's summary judgment motion insofar as the defendant sought judgment in its favor on the claim of fraudulent concealment under § 52-595.

of the unique bond of "trust and confidence" between the parties.

In its memorandum of decision on the defendant's motion for summary judgment, the trial court, *Schuman, J.*, concluded that the plaintiff's negligence claim sounded in informed consent because the sole rationale underlying the plaintiff's claim of entitlement to information concerning the risks associated with a transfusion from the defendant's blood supply was that such information would have assisted her in deciding whether to have the spinal surgery. The trial court further concluded that the plaintiff's claim is barred by this court's holding in *Petriello* v. *Kalman*, supra, 215 Conn. 384–85, that, when a physician who is not a hospital employee performs surgery on his or her patient in the hospital, the physician, and not the hospital, is responsible for obtaining the patient's informed consent to the surgery.[14] Consistent with this conclusion, the

[14] In light of our statement in *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 206, "that there was a genuine issue of material fact with respect to whether the defendant [had] committed an initial wrong upon the plaintiff by failing to inform her that the blood with which she was transfused had not been screened," the trial court acknowledged that "[a]n unqualified application of [that language in] *Sherwood* . . . would require [the trial] court to [conclude] that the defendant . . . did have a duty to provide information to the plaintiff concerning the blood transfusion as part of the informed consent process." In light of our holding in *Petriello*, however, the trial court read *Sherwood* as imposing a duty on the defendant to warn the plaintiff that its blood supply had not been tested for HIV antibodies *only if the hospital could have screened the blood for the presence of HIV antibodies but negligently failed to do so*. Cf. *Nieves* v. *Cirmo*, 67 Conn. App. 576, 585, 787 A.2d 650 (explaining that, in *Sherwood* v. *Danbury Hospital*, supra, 206, this court had addressed factual scenario in which "[a] test for screening blood existed prior to the plaintiff's receiving the transfusion, the [hospital] employees assumed that the blood given to the plaintiff had not been tested, and no one associated with the defendant hospital informed the plaintiff that the blood had not been tested *and that it could have been*" [emphasis added]), cert. denied, 259 Conn. 931, 793 A.2d 1085 (2002). Observing that the plaintiff's original complaint contained such an allegation; see footnote 9 of this opinion; the trial court further noted that, subsequent to the issuance of our earlier opinion in *Sherwood*, pretrial discovery in the case had proceeded, and the undisputed evidence obtained during the course

trial court also stated that the defendant did not owe the plaintiff a duty to inform Ogiela[15] that the ELISA test was to be implemented imminently because Ogiela was "perfectly capable of inquiring on his own about the status of a hospital's blood supply," and the plaintiff had provided no legal authority establishing a duty on the part of a hospital to inform a patient or a nonemployee physician of the status of the hospital's blood supply.[16] Finally, the trial court concluded that the plain-

---

of that discovery established that, at the time of the plaintiff's surgery, "the defendant *did not have the ELISA test available to it* and *did not knowingly provide the plaintiff with untested blood despite the availability of tested blood.*" (Emphasis added.) The trial court therefore concluded that the above quoted language in *Sherwood* v. *Danbury Hospital*, supra, 206, was not controlling in view of the changed factual posture of the case. In support of its conclusion, the trial court also noted that our opinion in *Sherwood* contained no reference to *Petriello*, and that it was extremely unlikely that this court would have intended to overrule *Petriello* sub silentio.

[15] See footnote 8 of this opinion.

[16] We note that the trial court initially denied the defendant's motion for summary judgment with respect to the plaintiff's allegations that the defendant negligently had failed to take measures to determine whether the blood that it provided to the plaintiff had been tested for HIV antibodies and "failed to remain educated as to the status of HIV testing in blood . . . ." Footnote 11 of this opinion. With respect to its ruling on these two allegations, the trial court observed that these allegations did not sound in informed consent but, rather, "make the different claim that, if the [defendant] had made greater efforts, it would have been able to prevent the distribution of untested blood in this case." Accordingly, the trial court concluded that these claims "fall within the holding of *Zichichi* [v. *Middlesex Memorial Hospital*, supra, 204 Conn. 410] that '[i]f a plaintiff can show that the defect in the blood could reasonably have been discovered or removed, the plaintiff may well be entitled to recover for the supplier's negligent failure to detect or remove the defect.' " Thereafter, the defendant sought reconsideration of the trial court's partial denial of its motion for summary judgment, claiming that "the [defendant] had no way to discover which particular units of blood in its inventory were tested and which were not," and that "*Zichichi* requires only that a hospital detect and/or remove defects from blood when it can reasonably do so; *Zichichi* does not require a hospital to do the impossible." The plaintiff conceded that, in light of the trial court's conclusion that the defendant had no duty to warn or to advise the plaintiff of the risks associated with a blood transfusion from its blood bank, she could not establish the defendant's liability on the basis of the two surviving allegations alone. Accordingly, the trial court granted the

tiff could not prevail on her claim that the defendant had breached a fiduciary duty to the plaintiff because the plaintiff had not established that a hospital owes a patient such a duty. Accordingly, the trial court granted the defendant's motion for summary judgment, and this appeal followed. On appeal, the plaintiff renews the claims that she raised in the trial court. We conclude that the trial court properly granted the defendant's motion for summary judgment.

As an initial matter, we set forth the appropriate standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 113–14, 869 A.2d 179 (2005). We now turn to the merits of the plaintiff's claims.

I

The plaintiff contends that the trial court improperly concluded that the defendant did not have a duty to inform her, either directly or through Ogiela, of the risks associated with the blood transfusion that she received intraoperatively. We disagree.

defendant's motion for reconsideration and rendered judgment for the defendant on those two remaining allegations, as well.

The first step in our analysis of the plaintiff's claim is to determine whether the trial court properly concluded that the plaintiff's negligence claim sounds in informed consent. The informed consent doctrine derives from the principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 288–89, 465 A.2d 294 (1983). "Informed consent requires a physician to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 810–11, 826 A.2d 1066 (2003). In previous cases in which we have considered an alleged lack of informed consent, our inquiry has been confined to whether the physician has disclosed: "(1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) *Logan* v. *Greenwich Hospital Assn.*, supra, 292; accord *Alswanger* v. *Smego*, 257 Conn. 58, 67–68, 776 A.2d 444 (2001). Thus, "[u]nlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent." *Dingle* v. *Belin*, 358 Md. 354, 369–70, 749 A.2d 157 (2000); see also *Pekera* v. *Purpora*, 80 Conn. App. 685, 691, 836 A.2d 1253 (2003) ("The distinction between a duty to exercise due care in the performance of requisite medical procedures and a duty to exercise due care in informing a patient of medical risks is not merely lin-

guistic. It reflects, instead, the fundamental difference between the appropriate performance of professional skills and the proper engagement of a patient in decision making about his or her professional care."), aff'd, 273 Conn. 348, 869 A.2d 1210 (2005); 61 Am. Jur. 2d 267, Physicians, Surgeons, Etc., § 152 (2002) ("A claim against a physician for negligence based on lack of informed consent is separate from a claim based on negligence in medical treatment, because it is based on information communicated by the physician to the patient before the procedure or treatment. A physician can be liable for failure to obtain informed consent before treatment without being negligent in the actual treatment of the patient.").

The essence of the plaintiff's claim of negligence is the defendant's alleged failure "to warn, inform and/or advise" the plaintiff of the risks associated with the blood transfusion, in particular, the fact that the defendant's blood supply had not been tested fully for HIV antibodies but would be tested fully soon, and the availability of alternatives to a blood transfusion with untested blood, such as the "postpone[ment] [of] elective surgery until tested blood became available," or "the use of autologous blood transfusions and a directed donor program . . . ." Thus, the plaintiff's negligence claim is not founded on the defendant's alleged lack of skill or proficiency in its screening, handling and dispensing of the blood in its blood bank but, rather, on the defendant's failure to apprise the plaintiff about the condition of the blood and the options available to the plaintiff under the circumstances. Because the plaintiff's claim is predicated entirely on the defendant's alleged failure to convey information to the plaintiff so that she could make an informed decision with respect to whether to proceed with the surgery as scheduled, we

agree with the trial court that the plaintiff's negligence claim sounds in informed consent.[17]

---

[17] The plaintiff also alleged, within the context of her negligence claim, that the defendant breached its duty to the plaintiff by failing "to warn, inform and/or advise [her] . . . that she had been administered blood that had not been tested for the presence of HIV [antibodies], and that she, therefore, was at risk for HIV infection and should be tested . . . ." Because this alleged duty continued beyond the date of the transfusion, it was the plaintiff's contention, in *Sherwood* v. *Danbury Hospital,* supra, 252 Conn. 193, that the existence of this duty gave rise to a genuine issue of material fact as to whether the defendant's ongoing breach of that duty tolled the three year repose period of § 52-584. We note that, in contrast to the plaintiff's other allegations of negligence, this allegation does not sound in informed consent because, although it is related, for purposes of the continuing course of conduct doctrine, to the defendant's preoperative failure to inform the plaintiff of the risks associated with the transfusion; see id., 207; the allegation concerns the breach of a *postoperative* duty on the part of the hospital, a duty that necessarily arose *after* the defendant allegedly had breached its preoperative duty to obtain the plaintiff's informed consent for the surgery. The plaintiff, however, has raised no claim, separate and apart from her contention generally that the trial court improperly determined that her negligence claim sounded in informed consent, that this particular allegation of negligence should have survived the trial court's granting of the defendant's motion for summary judgment. It therefore does not appear that the plaintiff relies on this allegation as a separate and distinct claim of negligence but, rather, as the basis for her tolling claim under the continuing course of conduct doctrine. More importantly, however, we fail to see how the defendant could have had a postoperative duty to warn the plaintiff about the risk of contracting HIV from the blood transfusion in light of our conclusion hereinafter that Ogiela, and not the defendant, had a duty to inform the plaintiff of that risk prior to the surgery. In such circumstances, the defendant was entitled (1) to rely on Ogiela to inform the plaintiff of that risk and, therefore, (2) to conclude that any postoperative warning to the plaintiff concerning that same risk was unnecessary and redundant of Ogiela's preoperative warning. Furthermore, in view of our conclusion hereinafter that the defendant had no preoperative duty to inform the plaintiff about the risks associated with her transfusion, we see no reason why the defendant had a duty to inform the plaintiff of those same essential risks after the surgery. Indeed, it would be bizarre to conclude that the defendant had no duty to inform the plaintiff of the risks of the transfusion prior thereto, when she could have avoided those risks altogether, but to impose a duty on the defendant to inform the plaintiff of those same risks after the transfusion, when the plaintiff could do no more than mitigate any harm caused by the transfusion. Thus, even if we assume that the plaintiff intends for her allegation of postoperative negligence to stand on its own, separate and distinct from her other allegations of negligence, that allegation does not survive our determination that Ogiela, and not the defendant, owed a duty of informed consent to the plaintiff.

Having concluded that the plaintiff's allegations of negligence sound in informed consent, we now address the plaintiff's contention that, notwithstanding our conclusion in *Petriello* v. *Kalman*, supra, 215 Conn. 384, that a hospital "has [no] . . . duty with respect to obtaining a patient's informed consent for a surgical procedure to be performed by a nonemployee physician," her claim is governed by our statement in *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 206, that "a hospital may be liable for negligently failing to inform a patient of the risks associated with the blood it has supplied for a transfusion," even though that transfusion was administered during a procedure performed by a physician who was not an employee of the hospital. We begin with a review of our opinion in *Petriello*. In *Petriello*, the plaintiff, Ann Petriello, was admitted to Griffin Hospital in Derby for a surgical procedure to be performed by her physician, Roy E. Kalman, who was not an employee of the hospital but, rather, an independent physician with attending privileges at the hospital. See *Petriello* v. *Kalman*, supra, 379 & n.1. It was the policy of Griffin Hospital that "[a] patient may not be sent to surgery nor may preoperative medication be given without proper completion of the [hospital's] informed consent form . . . ." (Internal quotation marks omitted.) Id., 379. Despite this policy, a nurse employed by Griffin Hospital administered preoperative medication to Petriello before Petriello had had an opportunity to review and to sign the hospital's informed consent form. In further disregard of this policy, Kalman, who knew that Petriello was under the influence of preoperative medication, nevertheless had Petriello sign the informed consent form and then proceeded to perform the surgical procedure. Id., 380. Thereafter, Petriello filed an action against both Kalman and Griffin Hospital for failing to obtain her informed consent to the surgery.[18] With respect to her claim

---

[18] Petriello's action also involved other claims not relevant to this appeal.

against Griffin Hospital, Petriello alleged that the hospital negligently had: (1) "permitt[ed] Kalman to perform the surgical procedure without having first obtained her informed consent"; and (2) "fail[ed] to obtain [her] informed consent itself, before Kalman performed the surgical procedure." Id., 382. The trial court directed a verdict in favor of Griffin Hospital on the ground that it did not have a duty to obtain Petriello's informed consent. Id. Petriello thereafter appealed from the judgment of the trial court to this court, and we affirmed. Id., 378, 398.

On appeal, Petriello claimed "that the duty involved in [the] case [was] the duty of reasonable care that [Griffin Hospital] owed to her as its patient"; id., 383; and that the hospital had breached this duty when a nurse employed by the hospital gave her preoperative medication before she had signed the informed consent form. Id. We disagreed, observing that, in *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 304, we had "[i]mplicitly . . . rejected the claim that a hospital has a duty with respect to obtaining a patient's informed consent for a surgical procedure to be performed by a nonemployee physician." *Petriello* v. *Kalman*, supra, 215 Conn. 384. We concluded that, because "there was no evidence of any involvement by a physician employed by [Griffin Hospital] prior to the start of the surgical procedure and [because Petriello did] not claim it was the duty of the nurse actually to obtain [Petriello's] informed consent prior to [the administration of] the preoperative medication, the duty to obtain such consent, prior to beginning the surgical procedure, rested wholly upon Kalman, [Petriello's] attending physician."[19] Id., 384–85. We also rejected Petriello's claim

---

[19] The plaintiff claims that *Petriello* is distinguishable from the present case because the defendant "was extensively involved with the plaintiff's surgery before it began insofar as it provided the blood for her transfusion from a hospital blood bank . . . ." We disagree with the plaintiff. As the defendant notes, our inquiry in *Petriello* into the involvement of hospital employees in the patient's preoperative care simply was for the purpose of

that Griffin Hospital, by virtue of adopting a policy that required patients to sign an informed consent form prior to surgery, "intended to assume a responsibility greater than the law imposed upon it already."[20] Id., 386. Accordingly, we concluded that Griffin Hospital did not have a duty to obtain Petriello's informed consent prior to her surgery because "Kalman [alone] shouldered the obligation to obtain his patient's informed consent, [and] the hospital could reasonably have relied upon his judgment and the manner in which he resolved the situation presented to him." Id., 388; see also id., 385 ("we have never held that . . . a hospital, whose facilities are utilized by independent physicians, as a kind of surety, must guarantee that informed consent is obtained prior to the commencement of any surgical procedure").

Under *Petriello*, therefore, it is solely the responsibility of the nonemployee treating physician, and not the duty of the hospital, to inform the patient of the risks and benefits of, and alternatives to, a proposed medical

ruling out Griffin Hospital's vicarious liability for any failure by an employee to obtain informed consent. See *Matthiessen* v. *Vanech*, 266 Conn. 822, 839, 836 A.2d 394 (2003) ("under the common-law principle of respondeat superior, an employer is vicariously liable for compensatory damages arising out of the tortious conduct of his employee when that conduct occurs during the course of the employee's employment"). Although, in *Petriello*, we left open the possibility that extensive involvement of a hospital-employed nurse or physician in the patient's preoperative care might give rise to a vicarious duty on the part of the hospital to obtain informed consent, the plaintiff in the present case has not alleged that any employee of the defendant was so extensively involved in her preoperative care that the defendant might be deemed to be vicariously liable for that employee's failure to obtain the plaintiff's informed consent.

[20] Specifically, we reasoned that the policy of the hospital requiring patients to sign an informed consent form prior to a surgical procedure "would serve as a directive to any employee physician, for whose wrongful act or omissions the hospital would be liable, to fulfill his duty of obtaining a patient's informed consent to a surgical procedure. It would also serve as a measure for reminding independent physicians of their duty to obtain such consent before surgery." *Petriello* v. *Kalman*, supra, 215 Conn. 386.

procedure, and to obtain the patient's informed consent before performing any such procedure. Indeed, nearly every jurisdiction that has considered this issue has arrived at the same conclusion. E.g., *Wells* v. *Storey*, 792 So. 2d 1034, 1039 (Ala. 1999); *Krane* v. *Saint Anthony Hospital Systems*, 738 P.2d 75, 77 (Colo. App. 1987); *Valcin* v. *Public Health Trust of Dade County*, 473 So. 2d 1297, 1307 (Fla. App. 1984), rev'd in part on other grounds, 507 So. 2d 596 (Fla. 1987); *Pauscher* v. *Iowa Methodist Medical Center*, 408 N.W.2d 355, 362 (Iowa 1987); *Lincoln* v. *Gupta*, 142 Mich. App. 615, 625, 370 N.W.2d 312 (1985); *Wilson* v. *Lockwood*, 711 S.W.2d 545, 549 (Mo. App. 1986); *Giese* v. *Stice*, 252 Neb. 913, 923, 567 N.W.2d 156 (1997); *Baird* v. *American Medical Optics*, 301 N.J. Super. 7, 12, 693 A.2d 904 (1997), modified on other grounds, 155 N.J. 54, 713 A.2d 1019 (1998); *Johnson* v. *Sears, Roebuck & Co.*, 113 N.M. 736, 737, 832 P.2d 797 (App.), cert. denied, 113 N.M. 744, 832 P.2d 1223 (1992); *Kershaw* v. *Reichert*, 445 N.W.2d 16, 17 (N.D. 1989); *Nevauex* v. *Park Place Hospital, Inc.*, 656 S.W.2d 923, 925 (Tex. App. 1983, writ ref'd n.r.e.); *Alexander* v. *Gonser*, 42 Wash. App. 234, 239, 711 P.2d 347 (1985), review denied, 105 Wash. 2d 1017 (1986).

The New Mexico Court of Appeals, in *Johnson* v. *Sears, Roebuck & Co.*, supra, 113 N.M. 736, explained the underlying rationale for the rule: "Although a hospital employee has the necessary skill and expertise to perform a procedure for which the employee has been trained, the employee does not necessarily have the requisite knowledge of a particular patient's medical history, diagnosis, or other circumstances which would enable the employee to fully disclose all pertinent information to the patient. . . . Without such knowledge, an employee's explanation of the risks and benefits of a procedure could be incomplete and might emphasize the risks inherent in any procedure without adequately describing the benefits and the specific reasons for

which the physician ordered the procedure. . . . The physician is uniquely qualified through education and training, and as a result of his or her relationship to the patient, to determine the information that the particular patient should have in order to give an informed consent." (Citations omitted.) Id.; see also *Kelly* v. *Methodist Hospital*, 444 Pa. Super. 427, 433, 664 A.2d 148 (1995) ("It is the surgeon and not the hospital who has the education, training and experience necessary to advise each patient of risks associated with the proposed surgery. Likewise, by virtue of his relationship with the patient, the physician is in the best position to know the patient's medical history and to evaluate and explain the risks of a particular operation in light of the particular medical history.").

It cannot reasonably be disputed that blood transfusions routinely are administered during or in connection with surgical procedures and that the risks normally associated with blood transfusions are well-known to surgeons. In fact, the plaintiff herself acknowledges that Ogiela, the physician who performed her surgery, had a duty to inform her of the risks attendant to her transfusion. Thus, for purposes of informed consent, there is no reason to distinguish blood transfusions from any of the other services rendered or functions performed by a hospital in connection with a surgical procedure, such as the provision of medical supplies, equipment or support staff. As is true with respect to those other functions, it is not the hospital but the patient's physician who, by virtue of his or her relationship with the patient and knowledge of the patient's medical condition and history, can best advise the patient of the risks and other pertinent information relative to a blood transfusion. E.g., *Jones* v. *Philadelphia College of Osteopathic Medicine*, 813 F. Sup. 1125, 1127, 1130 (E.D. Pa. 1993) (rejecting plaintiff's claim that hospital had duty to inform him of risk of con-

tracting HIV from transfused blood); *Ward* v. *Lutheran Hospitals & Homes Society of America, Inc.*, 963 P.2d 1031, 1033, 1038 (Alaska 1998) (rejecting plaintiff's claim that hospital had duty to inform her of risk of contracting hepatitis C from blood transfusion because it was duty of plaintiff's physician to obtain plaintiff's informed consent); *Goss* v. *Oklahoma Blood Institute*, 856 P.2d 998, 999, 1007 (Okla. App. 1990) (rejecting plaintiff's claim that hospital had duty to inform him of risk of contracting HIV from blood transfusion); *Howell* v. *Spokane & Inland Empire Blood Bank*, 114 Wash. 2d 42, 44–45, 56, 785 P.2d 815 (1990) (same). We agree with the courts of Oklahoma and Washington that "[t]o impose upon a hospital the duty to inform would be to require a hospital to intervene into the physician/patient relationship, more disruptive than beneficial to [the] patient. . . . In short . . . it [is] the duty of the physician ordering blood transfusions, rather than the hospital filling the physician's orders, to inform patients of the risks, general and specific, involved in the surgical procedures." (Citation omitted; internal quotation marks omitted.) *Goss* v. *Oklahoma Blood Institute*, supra, 1007, quoting *Howell* v. *Spokane & Inland Empire Blood Bank*, supra, 55–56. Indeed, with the exception of *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 193, the plaintiff has failed to cite any case in support of her contention that a hospital blood bank is obligated to inform a patient of the risks associated with a blood transfusion.

As the plaintiff maintains, we did state in *Sherwood* that "a hospital may be liable for negligently failing to inform a patient of the risks associated with the blood it has supplied for a transfusion." Id., 206. It also is true, however, that the sole issue raised in *Sherwood* was whether the plaintiff was entitled to the opportunity to prove, under the continuing course of treatment doctrine, that her action was not barred by the three year

repose provision of § 52-584 in light of the facts that had been adduced during pretrial discovery to date. In the course of our discussion of that issue, we considered, among other things, whether a genuine issue of material fact existed with respect to the first prong of the continuing course of treatment doctrine, in particular, whether the defendant had committed an "initial wrong" upon the plaintiff by virtue of its allegedly negligent failure to inform the plaintiff of the status of its blood supply. See id., 204, 206. Although we answered that question in the affirmative, we did not conduct an in-depth analysis of the viability of the plaintiff's negligence claim. Indeed, because the parties did not even address the first prong of the continuing course of treatment doctrine, their briefs did not even refer to the informed consent doctrine.

More importantly, however, as the trial court explained; see footnote 14 of this opinion; at the time we decided *Sherwood*, the plaintiff's complaint alleged, inter alia, that the defendant knowingly had administered untested blood to the plaintiff even though tested blood was available and that the defendant had failed to advise the plaintiff of that fact. See footnote 9 of this opinion. For purposes of the trial court's ruling on the defendant's summary judgment motion that was the subject of our review in our earlier opinion in *Sherwood*, we treated that allegation as undisputed.[21] The defendant concedes that, under that factual scenario, it would have had a duty to inform the plaintiff that the blood with which she was transfused had not been screened. In those circumstances, the defendant's knowledge of the status of its blood supply would have been superior

---

[21] In characterizing the allegation as undisputed, we presumably meant that the defendant had not disputed that allegation for purposes of its summary judgment motion, in which the defendant claimed merely that the plaintiff's negligence claim was barred by the three year repose provision of § 52-584. See *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 206.

to that of Ogiela, and, therefore, it would be reasonable to impose a duty to inform on the defendant. See footnote 26 of this opinion. Thus, when we decided *Sherwood*, the operative facts warranted the conclusion that, as we stated in *Sherwood*, a genuine issue of material fact existed "with respect to whether the defendant [had] committed an initial wrong upon the plaintiff by failing to inform her that the blood with which she was transfused had not been screened." *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 206.

Following the issuance of our opinion in *Sherwood*, however, the parties conducted additional pretrial discovery. As a result of that discovery, and before the defendant had filed the summary judgment motion that is the subject of this appeal, the defendant established, and the plaintiff does not dispute, that the defendant did not know, and could not have known, which units of blood in its blood bank's inventory had been screened for the presence of HIV antibodies and which units had not been so screened and, therefore, did not knowingly provide the plaintiff with unscreened blood as of the date of the plaintiff's surgery. Thus, the factual allegation that had provided the basis for our statement in *Sherwood* regarding the existence of an initial duty was no longer operative when the defendant filed its second motion for summary judgment. In light of that significant change in the factual posture of the case between the time that the defendant filed its first and second motions for summary judgment, the trial court correctly concluded that it was not bound by the relevant language from our earlier opinion in *Sherwood*. For that reason, we reject the plaintiff's contention that our earlier opinion in *Sherwood* controls this appeal.[22] We turn,

[22] Moreover, to the extent that our language in our earlier opinion in *Sherwood* may suggest that a hospital blood bank has a broader duty to patients of the hospital than the duty that we have identified in this opinion, we expressly disavow any such suggestion.

therefore, to the essential allegation of negligence contained in the plaintiff's complaint,[23] namely, that the defendant negligently had failed to inform the plaintiff, through Ogiela,[24] about the status of its blood supply.

The plaintiff alleges that the defendant breached a duty to her by failing to advise Ogiela that, in the very near future, all blood would be screened for HIV antibodies. In support of her claim, the plaintiff adduced the sworn testimony of two experts, Donegan, a physician and former blood bank director at a hospital in San Francisco, and Arthur J. Ammann, a physician who is the president of Global Strategies for HIV Prevention and a clinical professor of pediatric immunology at the University of California, Center for AIDS Prevention. Donegan and Ammann testified that, because the defendant had superior access to information regarding the status of the ELISA testing program, the defendant owed a duty to the plaintiff to inform Ogiela about the status of that program. We reject the plaintiff's claim because her own experts acknowledged that Ogiela's duty to the plaintiff required him to stay abreast of the condition of the defendant's blood supply, and because the undisputed facts reveal that Ogiela reasonably should have known that, in the immediate future, all of the blood in the defendant's blood bank would have been screened for HIV antibodies.

We first set forth the duty of informed consent that Ogiela owed to the plaintiff insofar as blood transfusions *generally* are concerned. As of April 19, 1985, the

---

[23] With respect to the allegation that the defendant was negligent in administering HIV infected blood to the plaintiff, the plaintiff has conceded that, in view of the facts that were adduced during the pretrial discovery that was conducted subsequent to the issuance of our earlier opinion in *Sherwood,* she cannot prove that allegation. In light of that concession, the trial court properly concluded that that aspect of the plaintiff's negligence claim is insufficient to defeat the motion for summary judgment that is the subject of this appeal.

[24] See footnote 8 of this opinion.

date of the plaintiff's surgery, it was common knowledge in the medical community that HIV could be transmitted via blood and, therefore, that it was possible to become infected with HIV through a blood transfusion. Thus, it was the duty of the plaintiff's treating physician, and not the duty of the defendant, to inform the plaintiff about the general risk of contracting HIV from a blood transfusion and the alternatives available to avoid this risk. The plaintiff does not dispute that *that* duty rested with Ogiela alone.

With respect to the implementation of the ELISA test and the fact that all newly donated blood soon would be subject to that test, both of the plaintiff's expert witnesses, Donegan and Ammann, testified that, at the time of the plaintiff's surgery, Ogiela, as the plaintiff's treating physician, had a duty to educate himself, either by inquiring of the defendant's blood bank or otherwise, about the imminent availability of fully tested blood.[25] In light of the fact that a patient's treating physician has a duty to obtain his or her patient's informed consent with respect to the risks attendant to a blood transfusion, and because, according to the plaintiff's experts, Ogiela should have known that all newly donated blood soon would be tested for HIV antibodies, we see no reason to impose a legal duty on the defendant to make Ogiela aware of information that, according to the plaintiff's experts, *Ogiela himself was obligated to obtain.* Although it might have been good practice for the defendant to have kept Ogiela and other attending physicians apprised of the status of the ELISA testing program to the extent that the defendant could have done so, only

---

[25] For example, Donegan testified that, at the time of the plaintiff's surgery, Ogiela had a "duty to keep himself abreast of the status of the blood supply," and Ammann likewise testified that the applicable standard of care required Ogiela to be aware of the status of the ELISA testing program. Both Donegan and Ammann also indicated that the existence of that testing program was well-known and, to the extent that Ogiela had any questions about the status of the program, he could have contacted the defendant's blood bank directly.

Ogiela had a legally cognizable duty to inform the plaintiff of the status of the defendant's blood supply and, further, that prudence dictated that her surgery be postponed for a short time until the risk of HIV infection effectively was eliminated. To conclude otherwise would be to treat the defendant as a kind of surety to guarantee that Ogiela properly had obtained the plaintiff's consent, a scenario that we expressly rejected in *Petriello* v. *Kalman*, supra, 215 Conn. 385.

Moreover, the plaintiff's experts indicated that it was common knowledge in the medical community that the Food and Drug Administration had approved the ELISA test, that the ELISA test would be implemented fully in the very near future and that surgeons were obligated to postpone elective surgery until fully tested blood had become available. For example, Donegan testified that "everyone knew that [the ELISA test] would be available within the foreseeable amount of time. . . . There was so much national pressure to get this test available. It was announced in the newspapers, in the journals, on the television. It was discussed everywhere." Indeed, Donegan testified that, at the time of the plaintiff's surgery, Ogiela would have known about the status of the ELISA testing program merely by "read[ing] the newspaper." Donegan further testified that, with respect to the plaintiff's elective surgery, Ogiela should have postponed the surgery because it would not have been a problem to do so for "longer than the six weeks it would have taken" for all newly donated blood to have been tested. Similarly, Ammann testified that, "[p]eople who were involved in HIV, AIDS and in blood banking and transfusion and using blood products were aware, through the media, through meetings, through newspaper articles, memos that were circulating . . . that there was going to imminently be an HIV test that would test blood products and tell you whether or not it came from a person who was HIV infected, and whether it

was safe to [transfuse]. And it was a matter of days, if not weeks, before that test would be available, so that a person would look at this situation of what was emerging with the Secretary of Health and Human Services . . . making national announcements involving the [United States] government, the [Food and Drug Administration], [the National Institute of Health], [The] New York Times, television programs, that now finally, after all these years, there was going to be a test to make it safe for people so that they wouldn't get this fatal HIV infection, and that this test was coming so soon that one could postpone any elective surgery and then wait until the test was available." Ammann further testified that he did not "believe, given the information and what was happening at a national level, at meetings and discussions and everything, that someone using blood, whether a pediatrician or an infectious disease or specialty internist, cardiologist, orthopedic surgeon, could be unaware of the risks at this time, and that there was going to be a blood test available."

This testimony by the plaintiff's experts buttresses our conclusion that Ogiela, and Ogiela alone, owed the plaintiff a duty to apprise her of the risks associated with the blood transfusion, including the risk of HIV infection if she did not postpone the surgery for up to several weeks until all newly donated blood would be tested. This is true, moreover, despite the testimony of the plaintiff's experts that the defendant nevertheless breached a duty to the plaintiff by failing to inform Ogiela that all blood soon would be tested. This is not a case in which Ogiela *reasonably* did not know about the status of the ELISA testing program because, according to the plaintiff's own experts, that information was widely known. In such circumstances, the defendant reasonably relied on Ogiela, as the treating physician, to advise the plaintiff that she could eliminate the risk of contracting HIV through a blood transfusion

by postponing her surgery until all blood in the defendant's blood bank was screened for HIV antibodies.[26] For these reasons, the trial court properly granted the defendant's motion for summary judgment on the plaintiff's negligence claim.

## II

The plaintiff next contends that the trial court improperly concluded that the defendant did not owe her a fiduciary duty to inform her of the risks associated with a blood transfusion from its blood supply. Specifically, the plaintiff claims that the defendant, "being the most knowledgeable regarding the status of blood, had a specific duty to act for the benefit of the plaintiff." We disagree.

"It is axiomatic that a party cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them. [A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Biller Associates* v. *Peterken*, 269 Conn. 716, 723, 849 A.2d 847 (2004). "The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. . . . Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts

---

[26] Of course, there may be circumstances under which a hospital has a duty to inform a patient's attending physician of certain risks or conditions that are known to the hospital and not known to the attending physician. In such circumstances, however, the hospital's duty arises from the fact that it would be unreasonable for the hospital to presume that the physician is aware of the particular risk or condition. In the present case, by contrast, the plaintiff's own experts testified that, as of the date of the plaintiff's surgery, Ogiela should have known that the defendant's blood bank soon would have only fully tested blood and, furthermore, that it was common knowledge in the medical community that fully tested blood would be available at hospital blood banks in the very near future.

to the fiduciary." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 455, 844 A.2d 836 (2004). Moreover, "[a]lthough we have not *expressly* limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations." (Emphasis in original.) *Murphy* v. *Wakelee*, 247 Conn. 396, 400, 721 A.2d 1181 (1998). Finally, "[p]rofessional negligence alone . . . does not give rise automatically to a claim for breach of fiduciary duty. . . . [Thus] not every instance of professional negligence results in a breach of [a] fiduciary duty. . . . Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty." (Citations omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56–57, 717 A.2d 724 (1998).

The plaintiff has provided scant reason to conclude that a hospital owes a patient the duty of a fiduciary. Nevertheless, even if we assume, arguendo, that the defendant owed the plaintiff such a duty, she has failed to demonstrate why the duty encompassed the responsibility of informing the plaintiff of the risks associated with a blood transfusion. As we have explained, Ogiela, and not the defendant, had a professional obligation to provide the plaintiff with that information. Although the plaintiff has alleged that the defendant breached both a general duty of care and a fiduciary duty by failing to inform the plaintiff of the risks associated with her transfusion, each of those purported duties is predicated on the same alleged facts; indeed, the plaintiff has failed to explain how those two duties differ in any material respect. Furthermore, beyond her contention that the defendant should have warned her of the risks of the transfusion and failed to do so, the plaintiff has not alleged any facts that would support

a claim of fraud, self-dealing, conflict of interest or the like. We conclude, therefore, that the plaintiff's claim of a breach of a fiduciary duty must fail.

The judgment is affirmed.

In this opinion the other justices concurred.