CHRISTOPHER NEUHAUS ET AL. *v.* CORINNE DECHOLNOKY ET AL.
(SC 17249)
(SC 17250)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued March 7—officially released October 3, 2006

*Charles D. Ray*, with whom was *David A. Reif*, and, on the brief, *Salvatore N. Fernaciari*, for the appellant (defendant Stamford Hospital).

*Carey B. Reilly*, for the appellees-appellants (plaintiffs).

*David J. Robertson*, for the appellee (named defendant).

*Jennifer A. Osowiecki* and *Jennifer L. Cox* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Opinion*

BORDEN, J. These jointly filed appeals involve the applicability of the three year statute of repose con-

tained in General Statutes § 52-584[1] to a medical malpractice action brought against two separate defendants. More specifically, the question before us is whether the plaintiffs' claims against the defendants[2] were time barred, or whether the statute of repose was tolled with respect to either of the defendants by the continuing course of conduct doctrine. The defendant Stamford Hospital (hospital) appeals from the judgment of the Appellate Court reversing the trial court's summary judgment rendered in favor of the hospital. *Neuhaus* v. *DeCholnoky*, 83 Conn. App. 576, 595, 850 A.2d 1106 (2004). The hospital claims that: (1) the Appellate Court improperly concluded that there were sufficient facts in dispute to warrant invocation of the continuing course of conduct doctrine; and (2) the Appellate Court's holding effectively eliminated the statute of repose in medical malpractice cases and improperly imposed a perpetual duty on physicians to warn patients of any risk of future harm. Additionally, the plaintiffs, Christopher Neuhaus (Christopher) and his parents, David Neuhaus and Andrea Neuhaus, individually and on behalf of their son, appeal from the judgment of the Appellate Court affirming the trial court's summary judgment rendered in favor of the named defendant, Corinne DeCholnoky. Id. The plaintiffs claim that sum-

---

[1] General Statutes § 52-584 provides in relevant part: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ."

[2] The plaintiffs, Christopher Neuhaus (Christopher), David Neuhaus and Andrea Neuhaus, brought suit separately against the defendant Stamford Hospital (hospital) as the facility that had diagnosed and cared for Christopher immediately following his birth, and the named defendant, Corinne DeCholnoky, who was Andrea Neuhaus' gynecologist and the treating obstetrician who had provided prenatal care and had delivered Christopher at the hospital on September 17, 1990.

mary judgment was inappropriate with respect to DeCholnoky because: (1) the Appellate Court improperly redefined the existence and scope of DeCholnoky's duty to the plaintiffs outside the factual requirements of General Statutes § 52-184c;[3] and (2) the Appellate Court failed to recognize DeCholnoky's duty to warn the plaintiffs of the known risks associated with her failure to conduct necessary tests prior to Christopher's delivery. We reverse the judgment of the Appellate Court with respect to the plaintiffs' claims against the hospital. We affirm, however, the judgment of the Appellate Court with respect to the plaintiffs' claims against DeCholnoky.

The plaintiffs brought an action against the defendants on July 16, 1996, alleging that both the hospital and DeCholnoky had been negligent in their care of Christopher and his mother during the course of Christopher's delivery on September 17, 1990.[4] Subsequently, the plaintiffs filed a request with the trial court to amend

---

[3] General Statutes § 52-184c (a) provides in relevant part: "In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider . . . the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."

[4] Specifically, the plaintiffs' complaint alleged that DeCholnoky negligently: (1) failed to care for, treat, monitor and supervise Andrea Neuhaus and Christopher adequately and properly during pregnancy, labor, delivery and in the postnatal period; (2) failed to perform an amniocentesis; (3) failed to perform appropriate testing to determine Christopher's lung maturity; (4) failed to permit Andrea Neuhaus to continue with the pregnancy; (5) prematurely induced Christopher's delivery prior to confirming lung maturity; (6) delivered Christopher with immature lungs; (7) failed to understand and misdiagnosed the meaning, cause and significance of Christopher's head size; and (8) failed to understand and misunderstood the consultation ordered by DeCholnoky concerning Christopher's head size.

their complaint to include the allegation that the hospital negligently had failed to inform the plaintiffs of certain serious conditions that Christopher was at risk of developing following his birth.[5]

The defendants separately moved for summary judgment on the theory that, because nearly six years had elapsed between the alleged wrongful conduct and the date the plaintiffs initially brought suit, the plaintiffs' actions were time barred under § 52-584. The plaintiffs claimed that their actions were filed timely because the continuing course of conduct doctrine served to toll the running of the relevant repose provision of the statute of limitations. The trial court[6] concluded that the continuing course of conduct doctrine was not applicable to the facts of the case and rendered summary judgment in favor of both of the defendants.

---

[5] Specifically, the plaintiffs' complaint alleged that the hospital negligently had: (1) failed to care for, treat, monitor, and supervise properly the medical condition of Christopher and his mother during pregnancy, labor and delivery; (2) failed to perform an amniocentesis prior to delivery; (3) failed to access adequately Christopher's lung maturity prior to permitting the induction of his mother's labor; and (4) delivered Christopher with immature lungs. All four of these allegations were contained in the plaintiffs' third amended complaint, dated May 26, 2000, which is the operative complaint in the case. The allegation that the hospital also negligently failed to inform the plaintiffs of certain serious conditions that Christopher was at risk for developing following his birth was made in a proposed fourth amended complaint dated January 28, 2002, which was introduced by the plaintiffs as part of a request for leave to make further amendments to their allegations. Although a ruling on this request still was pending when the trial court evaluated the defendants' motions for summary judgment, both the trial court and the Appellate Court incorporated the plaintiffs' duty to warn claim into their analysis and deemed the allegation denied by the hospital for the purpose of ruling on its motion for summary judgment.

[6] Because the defendants moved for summary judgment separately, the summary judgment motions of the hospital and DeCholnoky were granted as part of two different proceedings before two different trial courts, *Adams, J.,* and *Lewis, J.* For purposes of ease of discussion, and due to the similarity in the result, namely, that summary judgment was granted in favor of both defendants on the theory that the continuing course of conduct doctrine did not toll the relevant statute of limitations, we refer to the two trial courts in the singular throughout this opinion.

The plaintiffs appealed to the Appellate Court, which reversed the trial court's summary judgment rendered in favor of the hospital and affirmed the trial court's summary judgment rendered in favor of DeCholnoky. This appeal followed.

The opinion of the Appellate Court sets forth the following pertinent facts. "The plaintiff parents instituted this action on July 25, 1996, individually and on behalf of their son, Christopher, who was delivered prematurely at the hospital on September 17, 1990, with premature lungs and thereafter developed a condition known as respiratory distress syndrome.[7] The plaintiffs alleged that both DeCholnoky, who delivered the child, and the neonatologist, Gerald B. Rakos, an employee of the hospital, were negligent in several ways and that as a consequence, Christopher suffers from serious infirmities, including brain damage and cerebral palsy. Principally, [the plaintiffs] alleged that DeCholnoky failed to conduct adequate tests [including an amniocentesis][8] to determine the developmental readiness of the child's lungs for birth before inducing labor at thirty-seven weeks of gestation. As a result, they alleged, Christopher was delivered before his lungs had devel-

---

[7] Respiratory distress syndrome is an acute lung disease present at birth caused by immature fetal lungs. Specifically, in order for a newborn to breathe properly, the small air sacs at the ends of the breathing tubes must remain open so that oxygen in the air can get into the tiny blood vessels that surround the alveoli. Under normal circumstances, in the last months of pregnancy cells in the air sacs produce a substance called surfactant, which permits the air sacs to expand at the moment of birth. See National Institute of Health, Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/001563.htm The plaintiffs subsequently learned that, at the time of his delivery, Christopher's lungs were incapable of producing the levels of surfactant necessary to enable normal breathing.

[8] An amniocentesis is a prenatal test in which a small sample of amniotic fluid surrounding the fetus is removed and examined. Based on the results of this testing, fetal lung maturity can be determined. See National Institute of Health, Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003921.htm.

oped adequately. [Additionally] [t]he plaintiffs claim that Rakos failed to inform the plaintiff parents of the course of their child's treatment in the hospital and failed to warn them of the known risk of future developmental motor and mental health defects stemming from respiratory distress syndrome and, as a consequence, Christopher is now afflicted with multiple, severe infirmities, including permanent brain damage.

"The plaintiffs alleged that when Christopher was discharged from the hospital on October 3, 1990, he was given a clean bill of health by Rakos and that neither DeCholnoky nor Rakos told the parents that Christopher was at risk for subsequent infirmities due to respiratory distress syndrome. The plaintiffs claimed that it was only after the parents had switched pediatricians and requested Christopher's medical charts from the hospital that they . . . discovered that Christopher had received numerous blood transfusions and a spinal tap while in the care of the hospital. Most notably, the plaintiffs claim that it was only on review of Christopher's hospital records by their new pediatrician that the parents learned that brain damage is a known risk of respiratory distress syndrome.

"Separately, both defendants filed motions for summary judgment, asserting that the plaintiffs' action was barred by § 52-584, the applicable statute of limitations for medical malpractice actions, which requires that such a claim must be brought within two years of discovery of the injury, but in no event any later than three years from the act or omission. In response, the plaintiffs acknowledged that they did not bring the action within three years, but claimed that the second part of the statute, the three year repose provision, was tolled by the continuing course of conduct doctrine. In essence, they claimed that the defendants were under a continuing duty to inform the plaintiffs that Christopher was at risk for permanent medical damage resulting

from respiratory distress syndrome. . . . The [trial] court rejected the plaintiffs' claims and rendered summary judgment in favor of the defendants." Id., 579–80.

In addition, the record reflects that DeCholnoky was aware of the fact that a premature baby may develop respiratory distress syndrome after birth if his or her lungs are not fully developed. DeCholnoky similarly acknowledged that an amniocentesis is the only way to determine fetal lung maturity. Despite this fact, prior to inducing Christopher's birth, DeCholnoky did not perform an amniocentesis to determine if Christopher's lungs were sufficiently mature for delivery. The record further reflects, however, that upon Christopher's discharge from the hospital on October 3, 1990, neither the hospital nor DeCholnoky had any expectation that he would suffer some type of permanent injury in the future as a result of respiratory distress syndrome. Rakos testified that there was no way to predict the outcome of Christopher's respiratory distress syndrome, but that, "[b]ased upon his size and hospital course . . . there was no expectation that he would suffer a permanent injury." Similarly, DeCholnoky testified that at the time of his discharge from the hospital, Christopher was "fine and all of his testing was fine, so everyone thought he would be absolutely fine."

Moreover, the record reflects that DeCholnoky provided prenatal care to Andrea Neuhaus and continued to treat her through April, 1991, but that she ceased to render any care or treatment to Christopher following his delivery on September 17, 1990. The hospital had no involvement in Andrea Neuhaus' prenatal care or her care subsequent to Christopher's birth, and ceased to treat Christopher after his discharge from the hospital on October 3, 1990.

Following the decision of the Appellate Court reversing the trial court's summary judgment rendered

in favor of the hospital; see *Neuhaus* v. *DeCholnoky*, supra, 83 Conn. App. 586; the hospital petitioned this court for certification to appeal. We granted the petition, limited to the following issue: "Did the Appellate Court properly conclude that, as to the defendant Stamford Hospital, there were sufficient facts in dispute to warrant invocation of the continuing course of conduct doctrine?" *Neuhaus* v. *DeCholnoky*, 271 Conn. 903, 859 A.2d 563 (2004). Similarly, in light of the Appellate Court's decision to affirm the trial court's summary judgment rendered in favor of DeCholnoky; see *Neuhaus* v. *DeCholnoky*, supra, 83 Conn. App. 589; the plaintiffs also petitioned this court for certification to appeal. We granted the petition, limited to the following issue: "Did the Appellate Court improperly determine that the plaintiffs' claims against the named defendant, Corinne DeCholnoky, were barred by the three year repose section of General Statutes § 52-584, and that the continuing course of conduct doctrine did not apply?" *Neuhaus* v. *DeCholnoky*, 271 Conn. 904, 859 A.2d 563 (2004).

We begin with the appropriate standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted;

internal quotation marks omitted.) *Leisure Resort Technology, Inc.* v. *Trading Cove Associates*, 277 Conn. 21, 30–31, 889 A.2d 785 (2006).

I

## SUMMARY JUDGMENT RENDERED IN FAVOR OF THE HOSPITAL

The hospital claims that the Appellate Court improperly concluded that there were sufficient facts in dispute to warrant invocation of the continuing course of conduct doctrine and, thus, toll the repose provision in the relevant statute of limitations. In particular, the hospital contends that the plaintiffs were required, and failed, to present any evidence that the hospital believed or had actual knowledge that Christopher was susceptible to the more serious risks associated with respiratory distress syndrome, or that Christopher would suffer serious injuries in the future. The hospital also claims that the Appellate Court's decision improperly imposes a perpetual duty on a physician to warn patients of any risk of future harm regardless of whether he or she believes the risk is applicable to an individual patient, thus effectively eliminating the statute of repose in medical malpractice cases. Conversely, the plaintiffs claim that the Appellate Court's decision does not nullify the applicable statute of limitations, and that precedent supports the conclusion that there were sufficient facts in dispute to warrant tolling the three year repose provision set forth in § 52-584. We agree with the hospital.

The trial court based its decision to render summary judgment in favor of the hospital on the conclusion that the three year statute of repose contained in § 52-584 barred the plaintiffs' negligence claim. The repose provision of that statute provides in relevant part that "[n]o action . . . caused by negligence . . . or by malpractice of a physician . . . may be brought more than three years from the date of the act or omission com-

plained of . . . ." General Statutes § 52-584; see footnote 1 of this opinion. "It is well established that the relevant date of the act or omission complained of, as that phrase is used in § 52-584, is the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage. . . . Therefore, an action commenced more than three years from the date of the negligent act or omission complained of is barred by the statute of limitations contained in § 52-584, regardless of whether the plaintiff had not, or in the exercise of [reasonable] care, could not reasonably have discovered the nature of the injuries within that time period." (Citation omitted; internal quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 369, 746 A.2d 753 (2000).

We previously have recognized, however, that the repose section of the statute of limitations found in § 52-584 "may be tolled under the . . . continuing course of conduct doctrine, thereby allowing a plaintiff to commence his or her lawsuit at a later date." (Internal quotation marks omitted.) Id. "In its modern formulation, we have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of *the breach of a duty that remained in existence after commission of the original wrong related thereto*. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be diffi-

cult to identify and may yet be remedied." (Citations omitted; emphasis added; internal quotation marks omitted.) *Blanchette* v. *Barrett*, 229 Conn. 256, 275–76, 640 A.2d 74 (1994).

Furthermore, as we outlined in *Witt*, when deciding whether the trial court properly granted a defendant's motion for summary judgment in the context of the continuing course of conduct doctrine, we must determine if there is a genuine issue of material fact with respect to three factors. Specifically, we must assess whether "there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 370.

The hospital's arguments focus on the second prong of the continuing course of conduct doctrine, namely, whether it owed the plaintiffs a continuing duty.[9] The hospital contends that, based on existing precedent and the factual record of the case, as a matter of law it did not owe a continuing duty to the plaintiffs related to the original wrong, and therefore, that the second prong of the preceding framework is not satisfied. We agree.[10]

[9] The parties do not dispute that there were sufficient facts in dispute as to whether the hospital committed an initial wrong upon the plaintiffs. Indeed, the plaintiffs alleged, among other things, that the hospital had failed to: (1) properly care for, treat, monitor, and supervise Christopher and his mother's medical condition during pregnancy, labor and delivery; (2) perform an amniocentesis prior to delivery; (3) adequately assess Christopher's lung maturity prior to permitting the induction of his mother's labor; and (4) properly advise Christopher's parents regarding the nature of his medical condition, his prognosis, and the risk of permanent injury from respiratory distress syndrome See footnote 5 of this opinion. The hospital answered the plaintiffs' complaint, denied the allegations, and as part of its motion for summary judgment introduced affidavits and other testimony in support of the propriety of its conduct.

[10] In light of our conclusion that the hospital did not owe the plaintiffs a continuing duty to disclose all of the risk factors associated with respiratory

As previously noted, in this case it is an omission by the hospital that is the wrongful conduct in issue. Specifically, the plaintiffs contend that the hospital failed to advise the plaintiffs adequately of the risks associated with Christopher's respiratory distress syndrome, either at the time of discharge or in the subsequent approximately six year period prior to when the plaintiffs filed suit. The plaintiffs further contend that the hospital's duty to make such a disclosure was ongoing and that its failure to do so effectively tolled the statute of repose contained within the relevant statute of limitations.

When determining whether tolling under the continuous course of conduct doctrine is permissible, we repeatedly have held, in the medical treatment context, that continuing wrongful conduct may include acts of omission as well as affirmative acts of misconduct. See, e.g., *Blanchette* v. *Barrett*, supra, 229 Conn. 264 (physician's failure to monitor patient after initial misdiagnosis was continuing course of conduct that tolled statute of limitations); *Cross* v. *Huttenlocher* 185 Conn. 390, 400, 440 A.2d 952 (1981) (statute of limitations tolled because physician's failure to warn of potential adverse effects from medication was continuing course of conduct). As aptly noted by the Appellate Court in the present case, however, "a continuing duty must rest on the factual bedrock of actual knowledge." *Neuhaus* v. *DeCholnoky*, supra, 83 Conn. App. 583.

In particular, we have noted that "we disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis in the absence of proof that he subsequently learned that his diagnosis was incorrect. While there may be

distress syndrome, we need not reach the third prong of the *Witt* analysis and determine whether there was a genuine issue of material fact as to whether the defendants continually breached that duty.

instances in product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect . . . the same principle does not apply to a physician's misdiagnosis. To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis. We do not think that the language or policy of the statute permits such a reading." (Citations omitted.) *Blanchette* v. *Barrett*, supra, 229 Conn. 284; see also *Golden* v. *Johnson Memorial Hospital*, 66 Conn. App. 518, 529, 785 A.2d 234 ("[a]s a matter of law, to expect a [physician] to provide follow-up treatment or to instruct a patient on follow-up care after a negative diagnosis when there is no awareness that the diagnosis is wrong and there is no ongoing relationship is beyond the expectation of public policy"), cert. denied, 259 Conn. 902, 789 A.2d 990 (2001); *Hernandez* v. *Cirmo*, 67 Conn. App. 565, 569, 787 A.2d 657 (plaintiffs' claims were time barred despite physician's failure to warn plaintiffs of general risk that surgery may fail because there was no evidence that physician was aware that risk of failure was present with respect to these specific patients), cert. denied, 259 Conn. 931, 793 A.2d 1084 (2002).

We conclude that our analysis in *Blanchette*, as well as the persuasive application of this precedent by the Appellate Court to slightly different factual situations, are directly relevant to our analysis in the present case. At the time of Christopher's discharge from the hospital on October 3, 1990, it is undisputed that he had been given "a clean bill of health"; *Neuhaus* v. *DeCholnoky*, supra, 83 Conn. App. 579; and that Rakos, the representative of the hospital who had treated Christopher, believed that, "[b]ased upon his size and hospital course . . . there was no expectation that he would suffer a permanent injury." In light of his assessment that the

panoply of risk factors[11] associated with respiratory distress syndrome did not apply to Christopher's individual situation, Rakos elected not to discuss these risks with the plaintiffs.

The plaintiffs have presented no evidence that Rakos subsequently had reason to question his assessment of the applicability of the respiratory distress syndrome risk factors to Christopher, or that Rakos ever was confronted with actual knowledge that Christopher's treatment at the hospital had been mishandled, thus making the development of a serious injury in the future more probable. In short, in the absence of some evidence that Rakos actually had an initial concern about Christopher's prognosis, or that he subsequently became aware that his original assessment of Christopher's prognosis may have been incorrect, we conclude that the hospital did not have a continuing duty to inform the plaintiffs of all of the potential complications associated with Christopher's diagnosis. Indeed, Rakos already specifically had concluded that these complications did not apply to Christopher's situation. Accordingly, we decline to impose a continuing duty on the hospital to inform the plaintiffs that Christopher was at risk for developing serious complications as a result of respiratory distress syndrome when there is no evidence to suggest that Rakos believed this was the case.

This conclusion is also supported by our analysis in *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 363. Specifically, *Witt* involved a medical malpractice case wherein there was evidence that the defendant

---

[11] The possible complications of respiratory distress syndrome are extensive and include pneumothorax, pneumomediastinum, bronchopulmonary dysplasia, hemorrhage in the brain, pneumopericardium, hemorrhage in the lung, blindness, retrolental fibroplasia, delayed mental development and mental retardation. See National Institute of Health, Medline Plus Medical Encyclopedia,
http://www.nlm.nih.gov/medlineplus/ency/article/000084.htm.

physician had concern *"at the time of the diagnosis"* that his diagnosis was wrong or incomplete without further testing. (Emphasis in original.) Id., 375. The defendant subsequently wrote a note, eleven years later, expressing his prior and continuing concern about the possibility of the plaintiff developing cancer.[12] Id. We concluded that the note created a genuine issue of material fact as to whether the physician had a concern during the original course of treatment that never had been eliminated, thus suggesting at least the possibility that there was an omission known to the defendant contemporaneous to the original tort, and that the omission continued to be known to the defendant after the fact. Id., 376; id., 372 ("[i]t is this concern of cancer that, if it existed at the time of his initial diagnosis, gave rise to the defendant's continuing duty to warn, which in turn triggered the continuing course of conduct doctrine"). In short, in *Witt*, it was the defendant's initial and continuing concern that triggered his continuing duty to disclose, resulting in a tolling of the statute of repose contained in § 52-584. Id., 376. The same predicate facts that prompted us to apply the continuing course of conduct doctrine in *Witt* are simply not present in this case.

Furthermore, the hospital correctly points out that the application of the continuing course of conduct doctrine in this context, which essentially implies an application of the doctrine to any failure to warn claim regardless of the actual knowledge possessed by the defendant, effectively would nullify the repose portion of the statute of limitations contained in § 52-584. The purpose of "[a] statute of limitation or of repose is . . .

---

[12] Specifically, the defendant in *Witt* wrote a note to another one of the plaintiff's treating physicians stating in relevant part: "I'd be interested in a follow up on this patient!! I think at the time we were concerned that [the plaintiff] might be evolving a small lymphocytic lymphoma/CCL." (Internal quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 365.

to (1) prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability, and (2) to aid in the search for truth that may be impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci*, 271 Conn. 284, 296, 856 A.2d 408 (2004). This timing restriction with respect to claims of malpractice against a health care provider represents a valid policy choice by the legislature that should be respected in all but the most "exceptional circumstances"; *Lagassey* v. *State*, 268 Conn. 723, 752, 846 A.2d 831 (2004); because "any tolling of the statute of limitations may compromise the goals of the statute itself." *DeLeo* v. *Nusbaum*, 263 Conn. 588, 596, 821 A.2d 744 (2003).

Moreover, application of the continuing course of conduct doctrine in the context of the present case would allow the tolling of the relevant statute of limitations, intended as an exception to the clear legislative mandate, to become the rule because physicians would be faced with a continuing duty to warn patients of *any* risks associated with a present procedure or condition. What is even more troubling, is that such a duty seemingly would exist regardless of how remote the risk and regardless of whether the physician actually believed the risk had any chance of becoming a reality for the specific patient. Such an application of the continuing course of conduct doctrine would be both inconsistent with the duty we have imposed on physicians in different, but related, contexts, and unworkable in practice.

For example, in the context of informed consent, a physician is not required to warn a patient of each and every risk associated with a particular procedure.

Rather, he or she is only required to warn a patient of those risks that are material. See *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 291, 465 A.2d 294 (1983) (risk material when reasonable person, in what physician knows and should have known plaintiff's position to be, would attach significance to risk). In *Logan*, we implicitly recognized that a physician's treatment of his patient goes beyond the theoretical and the discussion of generalized risks, to include using professional judgment to separate the meaningful information from the academic based on the physician's understanding of the individual patient. The use of the same professional judgment comes into play when a physician assesses whether a patient is at risk for developing certain conditions that are related to a particular diagnosis.

Undeniably, serious consequences may ensue when a physician's professional judgment later proves to be incorrect. We are not, however, confronted with the question of whether Rakos or the hospital acted negligently by failing to recognize that Christopher actually was at risk of serious permanent injury. Rather, the issue that is before us is whether the continuing course of conduct doctrine tolls the relevant statute of limitations because the hospital was under a continuing legal duty to warn the plaintiffs of the universe of potential risks associated with respiratory distress syndrome. We decline to hold the hospital to such a high standard when there is no evidence to suggest that Rakos believed such risks applied to this particular patient.

From a practical standpoint, to conclude otherwise would be an open invitation for every plaintiff to add a failure to warn claim to his or her complaint in order to nullify an otherwise applicable statute of limitations.[13]

[13] For example, the hospital correctly points out that even a fairly common disease, such as chickenpox, places a patient at risk for a number of potential complications including: secondary bacterial infections, toxic shock syndrome, pneumonia, encephalitis, cerebellar ataxia, Reye syndrome, bleeding disorders and death. See Centers for Disease Control and Prevention, Manual

Such a result would conflict with the legislature's general mandate in § 52-584 that no medical malpractice action "may be brought more than three years from the date of the act or omission complained of," as well as with our statement in *Blanchette* v. *Barrett*, supra, 229 Conn. 284, that such a heightened duty "would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis."

The plaintiffs contend that this case does not involve a misdiagnosis by the defendant and, therefore, that our holding in *Blanchette* emphasizing the importance of actual knowledge on the part of the defendant before imposing a continuing duty to warn the plaintiff, does not apply. We disagree.

The plaintiffs incorrectly focus on the label attached to their claims, namely, whether Rakos failed to diagnosis accurately Christopher's underlying condition, or whether, even if he properly had diagnosed the respiratory distress syndrome, Rakos failed to assess accurately the applicability of certain serious potential complications to Christopher's future prognosis. Such a distinction is irrelevant for the purpose of assessing the applicability of the continuing course of conduct doctrine to the facts of this case.

Even if Rakos' determination that Christopher was not at risk for any serious complications as a result of his respiratory distress syndrome is not properly

for the Surveillance of Vaccine-Preventable Diseases (3d Ed. 2002) c. 14, p. 14-1. If we were to apply the continuous course of treatment doctrine in such a case, so long as a physician discharging a patient with chickenpox was generally aware of these risks, a duty would arise to inform the patient of each and every risk, regardless of whether the physician believed an individual risk applied to the patient. Additionally, the physician's duty would remain in existence for the life of the patient, because as long as the physician was generally aware of the risk, the three year statute of repose never would run as to that particular risk. This result is unreasonable, and is inconsistent with both § 52-584 and our precedent.

characterized as a diagnosis, it was the functional equivalent of a diagnosis in that it represented a separate assessment and conclusion by Rakos based on his professional knowledge and judgment of the applicability of certain risk factors to his patient. These same qualities were present in the context of the missed diagnosis of breast cancer in *Blanchette* v. *Barrett,* supra, 229 Conn. 284, when we concluded that a physician who has misdiagnosed a condition does not have a continuing duty to correct that misdiagnosis in the absence of proof that he subsequently learned that the diagnosis was flawed. In short, when recognizing a continuing duty to warn, the key is not whether a physician's action is labeled as a diagnosis or a prognosis, but whether a physician has *actual knowledge* that he or she may have improperly advised a patient.

The plaintiffs also suggest that Rakos' deposition testimony established that there was a genuine issue of material fact as to whether the hospital was aware that Christopher was at risk for developing serious injuries as a result of respiratory distress syndrome. We disagree.

Specifically, the plaintiffs refer to Rakos' deposition testimony wherein he discussed the types of conversations he typically has at the time of discharge with parents of premature newborns.[14] This testimony pre-

---

[14] The following exchange between the plaintiffs' counsel and Rakos reveals the relevant examination from Rakos' deposition:

"[The Plaintiffs' Counsel]: And in terms of long-term prognosis, usual conversation that you have, do you indicate that some children who have had respiratory distress problems sometimes do not have normal brain outcomes . . . or something along those lines?

"[Rakos]: The nature of the conversation we have when, so the dust is settled and the babies are going home, has more to do with their gestational age and neurological complications that they had during the hospitalization.

"[The Plaintiffs' Counsel]: And I take it from that that you don't address what the future neurologic course might include?

"[Rakos]: That's a question that every patient asks us, and our answers are fairly standard in the context of the clinical situation, which is very variable. So you can have a very premature baby who had intraventricular

sented in a very general manner the nature of conversations Rakos might have with parents of babies suffering from respiratory distress syndrome. In particular, Rakos testified that, in the case of "more mature babies who had respiratory [distress] problems and otherwise [were] totally fine, we would have a very different kind of conversation that didn't focus much on neurologic [issues] because those risks are very low." Rakos' recognition of a general risk for a hypothetical "more mature bab[y]," however, must be viewed in conjunction with his other testimony, and in particular his specific assessment of Christopher's future prognosis contained in a sworn affidavit, wherein he concluded: "At the time of Christopher's discharge from the [newborn intensive care unit], there was no way to predict the outcome of his [respiratory distress syndrome]. Based upon his size and hospital course, however, there was no expectation that he would suffer permanent injury." In the absence of any conflicting evidence from the plaintiffs regarding Rakos' assessment of Christopher's prognosis,[15] this testimony makes clear that, although Rakos was generally aware that babies with respiratory distress syndrome

---

hemorrhage and had a seizure and had a conversation that says not all of these babies have neurological problems, but, clearly, these are bad risk factors, and we need to be careful about follow-up.

"And the other side is of more mature babies who had respiratory problems and otherwise [were] totally fine, we would have a very different kind of conversation that didn't focus much on neurologic, because those risks are very low."

[15] We recognize that the plaintiffs also submitted an affidavit from an expert who had opined on the nature of the conversations that he would expect a physician to have with parents of babies with respiratory distress problems. This affidavit did not offer any evidence suggesting that the hospital actually knew or believed that Christopher was at risk for serious permanent injuries and complications, and did not offer an opinion as to whether the hospital's alleged failure to warn the plaintiffs had anything to do with Christopher's subsequent injuries. Rather, the plaintiffs' expert affidavit opined only that: (1) Christopher's prognosis included his being at risk for permanent complications because of the immaturity of his lungs; and (2) the hospital should have warned the plaintiffs of this risk.

may be at risk for serious neurological problems, he did not believe, and did not have any actual knowledge that Christopher was at risk for developing such a condition.

Additionally, the plaintiffs claim that the present case is analogous to *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 212, 746 A.2d 730 (2000) (*Sherwood I*), in which we concluded that the defendant hospital had a continuing duty to warn the plaintiff that she had been transfused with blood that had not been tested for the presence of human immunodeficiency virus (HIV) antibodies, and that she was at risk of being infected with HIV. We disagree.

Our recent clarification in *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 896 A.2d 777 (2006) (*Sherwood II*), of the factual premise that served as the underpinning for our initial ruling, makes clear that *Sherwood I* does not control the present case. Specifically, in *Sherwood II*, we noted that the plaintiff's initial complaint had alleged that the defendant *knowingly* had administered untested blood to the plaintiff even though tested blood was available and that the defendant had failed to advise the plaintiff of that fact. Id., 189. For the purposes of our initial review of the trial court's ruling on summary judgment, we treated that allegation as undisputed.[16] Id. Subsequently, further discovery by the parties established "that the defendant did not know, and could not have known, which units of blood in its blood bank's inventory had been screened for the

---

[16] Accordingly, in *Sherwood I*, supra, 252 Conn. 208, we noted that the plaintiff had presented undisputed evidence that the defendant failed to warn the plaintiff that she had been given potentially tainted blood and, therefore, was at risk for HIV. See id., 208–209 ("This continuous failure to notify is similar to the continuous failure to monitor that we found actionable in *Blanchette* . . . . Therefore, we conclude that this evidence of the defendant's continuing failure to notify was sufficient to create a genuine issue of material fact with regard to whether the defendant breached its ongoing duty of care to the plaintiff.").

presence of HIV antibodies and which units had not been so screened and, therefore, [the defendant] did not knowingly provide the plaintiff with unscreened blood as of the date of the plaintiff's surgery. Thus, the factual allegation that had provided the basis for our statement in *Sherwood* [*I*] regarding the existence of an initial duty was no longer operative when the defendant filed its second motion for summary judgment." Id., 190. In short, actual knowledge on the part of the defendant regarding the untested nature of the blood supply provided to the plaintiff was a factual predicate to our holding in *Sherwood I*. In the absence of such actual knowledge, however, we concluded "that the defendant had no preoperative duty to inform the plaintiff about the risks associated with her transfusion, [and that] we see no reason why the defendant had a duty to inform the plaintiff of those same essential risks after the surgery." Id., 182 n.17.

Finally, the plaintiffs contend that the application of the continuing course of conduct doctrine to the present case does not effectively eliminate the relevant statute of limitations found in § 52-584. Specifically, the plaintiffs contend that, even upon applying the continuous course of conduct doctrine, a plaintiff still has only three years at the most within which to file suit from the date of the act or omission complained of. Additionally, the plaintiffs claim that the applicable standard of care of a reasonably prudent similar health care provider establishes a safeguard against the overextension of the statute of repose. We disagree.

Despite the plaintiffs' assertions in their brief to the contrary, if their position were to be adopted, we fail to see how the three year statute of repose contained in § 52-584 still can be given effect. Indeed, at oral argument before this court, the plaintiffs were unable to provide us with one example of a situation in which their theory did not effectively eliminate the legisla-

ture's clearly stated limitation period for a defendant's liability in medical malpractice actions. The plaintiffs' argument assumes that, so long as no warning is given to the patient regarding a particular risk factor, "the act or omission complained of" will continue indefinitely as to the physician's obligation to notify the patient of that risk, regardless of how remote the risk may be, until the physician provides the patient with an adequate warning. Thus, although a plaintiff may have only three years to bring an action from the event complained of, under the plaintiffs' argument, that event, namely, the ongoing failure to warn of all potential complications associated with a particular condition, does not represent a finite date that provides a defendant with certainty as to when its potential liability ends. With respect to misdiagnosis cases, such an approach essentially would convert § 52-584 from a repose statute into a discovery statute, in which the statute of limitations would not run until the plaintiff discovers that he is at risk for a potential injury. Such a revision represents a policy decision more properly left to the legislature, not this court, to adopt.

Similarly, the plaintiffs' argument that the applicable standard of care for physicians provides a safeguard against overextension of the statute of repose is equally without merit. If the plaintiffs' extension of the continuous course of conduct doctrine were to be accepted, a plaintiff in a misdiagnosis case still would be able to frustrate the statute of repose under § 52-584 simply by retaining an expert who is willing to say that the standard of care required the defendant to warn the plaintiff of the possibility of developing a particular condition. Such an approach would require a defendant to bear the expense of a defense, the risk of litigation, and the possibility of lost witnesses and evidence, regardless of how many years before suit the alleged misconduct may have occurred. As our courts have noted, this type

of ongoing exposure is exactly what the legislature sought to avoid in establishing the three year statute of repose in § 52-584. See *Sanborn* v. *Greenwald,* 39 Conn. App. 289, 305, 664 A.2d 803 (§ 52-584 "reflects a policy of law, as declared by the legislature, that after a given length of time a [defendant] should be sheltered from liability and furthers the public policy of allowing people, after the lapse of a reasonable time, to plan their affairs with a degree of certainty, free from the disruptive burden of protracted and unknown potential liability" [internal quotation marks omitted]), cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995). Therefore, we conclude that the continuing course of conduct doctrine does not apply and, accordingly, that the plaintiffs' claims against the hospital are statutorily barred by the repose provision in § 52-584.

## II

### SUMMARY JUDGMENT RENDERED IN FAVOR OF DECHOLNOKY

We now consider whether the Appellate Court improperly determined that the plaintiffs' claims against DeCholnoky were barred by the three year statute of repose set forth in § 52-584. In particular, we look to whether the Appellate Court properly determined that there was no genuine issue of material fact as to whether DeCholnoky was under a continuing duty to warn the plaintiffs of the potential complications associated with respiratory distress syndrome.

The plaintiffs claim that the continuing course of conduct doctrine tolled the relevant statute of repose with respect to DeCholnoky's conduct, and that it was improper for the Appellate Court to define the existence and scope of DeCholnoky's duty to the plaintiffs because, pursuant to § 52-184c,[17] the legislature already

---

[17] See footnote 3 of this opinion.

has established that a physician has the duty to provide his patients with the same medical care as that of a reasonably prudent similar physician. The plaintiffs also contend that the Appellate Court lacked the medical expertise to determine the particular care required under the circumstances of this case. Furthermore, the plaintiffs contend that, on the basis of what DeCholnoky knew of Christopher's condition at the time of his birth, it was foreseeable that harm was likely to result and, therefore, DeCholnoky had a responsibility to warn the plaintiffs of the risk of serious injury.[18] Conversely, DeCholnoky claims that whether a legal duty exists is a question of law that is distinct from the definition of the applicable standard of care contained in § 52-184c and that she did not owe a continuing duty to the plain-

[18] We are mindful that the plaintiffs initially argued before the trial court that there was a special relationship between DeCholnoky and Christopher that imposed a continuing duty on DeCholnoky to warn the plaintiffs of the risks associated with respiratory distress syndrome. The trial court rejected this argument and found no support for the notion that a special relationship continued to exist indefinitely into the future simply because at one time in the past there was a physician-patient relationship. The plaintiffs abandoned this argument on appeal. While before the Appellate Court, the plaintiffs primarily argued that the trial court improperly had found that the plaintiffs had not alleged or presented any evidence pertaining to a subsequent wrong. Specifically, the plaintiffs claimed that DeCholnoky had committed a subsequent wrong that triggered the continuing course of conduct doctrine because she failed to tell the plaintiffs that Christopher had respiratory distress syndrome and may be at risk for serious injury. On appeal to this court, however, the plaintiffs changed their approach once again and introduced three new arguments in support of the claim that DeCholnoky owed a continuing duty to the plaintiffs. We find the plaintiffs' repeated shift in arguments to be troubling because, as we previously have noted, "to review . . . claim[s] . . . articulated for the first time on appeal and not [raised] before the trial court, would [be nothing more than] a trial by ambuscade of the trial judge." *State* v. *Robinson*, 227 Conn. 711, 741, 631 A.2d 288 (1993). Although it would be in our judicial discretion not to do so, we elect to review the plaintiffs' new arguments, however, because they are made within the context of the general claim that DeCholnoky was under a continuing duty to warn the plaintiffs that Christopher was at risk for serious injury, which is a claim that consistently has been advanced at all stages of this appeal.

tiffs to warn them that Christopher may be at risk for developing serious health problems after birth. We agree with DeCholnoky.

Our analysis of the plaintiffs' claims is similarly guided by our discussions of the continuing course of conduct doctrine in *Blanchette* v. *Barrett*, supra, 229 Conn. 275. As noted in part I of this opinion, "we have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto." (Internal quotation marks omitted.) Id. We are also mindful that, as has been aptly noted by the Appellate Court, "[t]he gravamen of the continuing course of conduct doctrine is that a duty continues after the original wrong is committed"; *Golden* v. *Johnson Memorial Hospital, Inc.*, supra, 66 Conn. App. 525; and that "before the doctrine can be applied, a duty must first be found to have existed." Id., 526. Accordingly, in order for the plaintiffs to prevail they must be able to demonstrate that DeCholnoky had a duty to Christopher subsequent to his delivery and diagnosis with respiratory distress syndrome in September, 1990.

"The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in

the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." (Citations omitted; internal quotation marks omitted.) *Mendillo* v. *Board of Education*, 246 Conn. 456, 483–84, 717 A.2d 1177 (1998). We also have noted, however, that we are not required to address the first prong as to foreseeability if we determine, based on the public policy prong, that no duty of care existed. See *Gomes* v. *Commercial Union Ins. Co.*, 258 Conn. 603, 618 n.11, 783 A.2d 462 (2001).

Given the fact that Christopher ceased to be under DeCholnoky's care subsequent to his birth, we agree with the Appellate Court's analysis and conclude that, as a matter of public policy, DeCholnoky did not have a duty to warn the plaintiffs of the known health risks flowing from a diagnosis of respiratory distress syndrome. As noted previously, the record establishes that DeCholnoky rendered prenatal care to Andrea Neuhaus and was also her treating gynecologist until April, 1991. With respect to Christopher, however, DeCholnoky ceased to render any care or treatment following his delivery on September 17, 1990. Indeed, upon delivery, the responsibility for Christopher's care was assumed by Rakos, who diagnosed Christopher as having respiratory distress syndrome. Although DeCholnoky was aware of this diagnosis, the fact remains that she had stopped treating Christopher as of the date of his prematurely induced delivery. In the absence of some continuing treatment of Christopher, we are unwilling to impose upon DeCholnoky a duty to warn the plaintiffs that Christopher was at risk for serious injury after birth. To do so would be duplicative of the duty already held by Rakos, Christopher's treating physician at the time, and also would be extremely burdensome in that it would impose a similar duty on all physicians who subsequently become aware of a diagnosis made for a former patient. Accordingly, with respect to the diagno-

sis of respiratory distress syndrome, the plaintiffs have failed to satisfy the initial wrong prong under *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 370, without which they cannot, as a matter of law, rely upon the continuing course of conduct doctrine to toll the statute of repose in § 52-584.

This conclusion is not to say that DeCholnoky did not hold a duty toward the plaintiffs during the period prior to Christopher's birth when she provided prenatal care to Andrea Neuhaus and advised her, without the benefit of additional testing regarding Christopher's lung maturity, that labor should be induced at approximately thirty-seven weeks gestation. This initial duty of care and possible negligence on the part of DeCholnoky prior to Christopher's delivery, however, is distinct from any duty to warn that may have existed with respect to respiratory distress syndrome that existed after DeCholnoky's treatment of Christopher had concluded. In short, prior to delivery, a clear physician-patient relationship between DeCholnoky and Christopher had been established, while after delivery that relationship ceased; thus any basis for a duty owed by DeCholnoky to Christopher in the postdelivery period must be separately established.

In light of the separate nature of these two duties, therefore, the plaintiffs cannot toll the relevant statute of limitations by combining DeCholnoky's established duty to refrain from delivering Christopher with immature lungs, with a separate and distinct duty to advise Christopher's parents after his birth of the risks of respiratory distress syndrome, in order to establish an ongoing wrong warranting the use of the continuing course of conduct doctrine. Rather, in light of our conclusion that DeCholnoky's duty toward Christopher as his treating physician ceased as of the date he was delivered and his care was transferred to Rakos, the plaintiffs are required to demonstrate that DeCholnoky also pos-

sessed a separate postdelivery duty to warn them that Christopher was at risk for serious complications as a result of his respiratory distress syndrome, and that DeCholnoky continually breached that duty in the years that followed. For the reasons stated previously, we cannot conclude that DeCholnoky ever owed the plaintiffs such a duty.

We are also mindful that the allegations of negligence against DeCholnoky initially made by the plaintiffs, all relate to conduct that took place prior to Christopher's birth, when a clear physician-patient relationship was still in effect. See footnote 4 of this opinion. Accordingly, the plaintiffs contend that, pursuant to the continuous course of conduct doctrine, the initial wrong in issue is actually that DeCholnoky was negligent in her care prior to Christopher's delivery and that she breached a duty to warn Christopher's parents of the risks associated with inducing labor without first performing an amniocentesis.

Even if DeCholnoky negligently had failed to carry out these duties, the plaintiffs had at most three years from the date when DeCholnoky induced labor in order to bring a claim of malpractice. The continuing course of conduct doctrine does not toll the relevant statute of limitations in this context because that alleged act of negligence was a discrete act that took place in the time period before Christopher's birth. Moreover, it is undisputed that immediately following Christopher's delivery DeCholnoky ceased to be his treating physician. Therefore, she did not provide any continuing treatment to Christopher after September 17, 1990. In short, if negligence existed on DeCholnoky's part, it did not extend beyond Christopher's delivery when DeCholnoky no longer cared for Christopher and her duty to

him had terminated.[19] Accordingly, the plaintiffs are unable to satisfy the continuing duty prong of the *Witt* analysis, and the statute of limitations started, and continued to run, as of the date of Christopher's birth.

The plaintiffs also contend that § 52-184c; see footnote 3 of this opinion; defines DeCholnoky's duty toward the plaintiffs, namely, that she must provide her patients with the same medical care and treatment as that of a reasonably prudent board certified obstetrician, and that it is improper for the courts to attempt to redefine the scope of this duty as anything other than what is required by § 52-184c. We disagree that we have improperly engaged in such behavior.[20] Indeed, our courts routinely examine whether to extend a duty to a particular defendant, at least in part, in light of the policy considerations at play in the case, much as we have done here by referencing the fact that extending a continuing duty to DeCholnoky would place an undue burden on physicians in general because it would potentially extend their liability indefinitely and also duplicate the duty already held by Rakos once he assumed responsibility for Christopher's care. See *Zamstein* v. *Marvasti*, 240 Conn. 549, 559, 692 A.2d 781 (1997) (court-appointed psychiatrist who had performed evaluation of plaintiff's children to determine whether they had been sexually abused owed plaintiff no duty of care, because imposing such duty would be contrary

---

[19] We also reiterate that, as with Rakos, there is no evidence to suggest that DeCholnoky had actual knowledge of a continuing health risk to Christopher following his birth about which she was uniquely aware and that she failed to inform the plaintiffs. To the contrary, DeCholnoky testified that at the time of his discharge from the hospital Christopher was "fine and all of his testing was fine, so everyone thought he would be absolutely fine."

[20] In particular, we note that the plaintiffs' allegations against DeCholnoky all relate to conduct that took place before Christopher's birth; see footnote 4 of this opinion; and that the plaintiffs did not introduce any expert affidavits or other testimony stating that the standard of care required that DeCholnoky's duty toward the plaintiffs continued once Christopher's care was transferred to Rakos.

to state's public policy of encouraging reporting and investigation of suspected child abuse).

Furthermore, we recognize that § 52-184c statutorily defines the standard of care in a medical malpractice case. Specifically, in order to establish medical negligence, a plaintiff must demonstrate that the defendant breached "the prevailing professional standard of care for that health care provider." General Statutes § 52-184c (a). Section 52-184c (a) provides further clarity by defining the professional standard of care as "that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." This standard, however, does not imply, and there is no language elsewhere in the statute to suggest, that § 52-184c is intended to override the requirements of the continuing course of conduct doctrine as a tolling mechanism for the statute of repose. See *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 369. Those requirements remain, as a matter of common law, and as we previously have discussed in detail, the plaintiffs have not met them with respect to DeCholnoky's conduct; thus, regardless of the requirements of § 52-184c, the plaintiffs are unable to demonstrate that their claims were not time barred by the three year statute of repose.

Similarly, we also reject the plaintiffs' claim that the Appellate Court lacked the medical expertise necessary to make the proper factual determination concerning the particular care that was owed under the circumstances. Briefly stated, the issue before us is one of legal duty, not the proper standard of care when assessing medical negligence. It is not necessary for a court to make an expert medical determination in this case in order to conclude, as we have here, that, once DeCholnoky delivered Christopher, and Rakos assumed responsibility for his care, DeCholnoky's legal duty had

ended and she was under no obligation to warn the plaintiffs of the risks associated with Christopher being born with immature lungs.

Finally, the plaintiffs contend that, on the basis of DeCholnoky's knowledge of Christopher's condition at the time of his birth: (1) because it was foreseeable that harm was likely to result, DeCholnoky had a responsibility to warn the plaintiffs of the risk of serious injury; and (2) public policy interests weighed in favor of imposing a continuing duty on DeCholnoky to warn the plaintiffs. We disagree.

First, the "foreseeability of [the] harm" addressed by the plaintiff does not play any role in our analysis. Indeed, as we stated in *Gomes* v. *Commercial Union Ins. Co.*, supra, 258 Conn. 618 n.11, we are not required to address the issue of foreseeability if we determine, based on the public policy prong, that no duty of care existed. Accordingly, the plaintiffs' discussion of foreseeability in this context is inapposite.

With respect to the public policy question, the plaintiffs make a variety of arguments in support of imposing a continuing duty on DeCholnoky to warn the plaintiffs of the risks associated with respiratory distress syndrome and the decision to induce labor prematurely without performing an amniocentesis. These arguments include: (1) the need to prevent physicians from hiding from their legal responsibility and to inform patients fully and fairly of the harmful risks associated with medical conditions; and (2) that fairness mandates that the duty to warn should last as long as the injurious consequences emanate from the failure to warn. We are not persuaded.

If a physician is obligated to inform a patient about a condition and fails to do so, the physician can be held liable for that failure so long as the applicable statute

of limitations has not expired. Our analysis does not extinguish this liability. Rather, the issue before us concerns the statute of limitations and claims that have been brought long after that statute has run. Similarly, if we were to hold that the duty to warn extended as long as the damaging consequences from the failure to warn were still ongoing, it effectively would eliminate the prescribed statute of limitations in duty to warn cases. In short, Christopher's physicians potentially could be sued by him as long as his injuries remained in existence, which implies at any time during his life. Such a result ignores the equally important policy choice made by the legislature in § 52-584 that "after the lapse of a reasonable time, [defendants in medical malpractice cases should be able] to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability . . . ." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci,* supra, 271 Conn. 296. Accordingly, we conclude that the continuing course of conduct doctrine does not apply to DeCholnoky's actions and that the plaintiffs' claims against DeCholnoky are barred by the three year statute of repose set forth in § 52-584.

On the hospital's appeal, the judgment of the Appellate Court is reversed with respect to the plaintiffs' claims against the hospital and the case is remanded to that court with direction to affirm the judgment of the trial court; on the plaintiffs' appeal, the judgment of the Appellate Court is affirmed with respect to the plaintiffs' claims against DeCholnoky.

In this opinion the other justices concurred.